In re NEWELL'S ESTATE.
NEWELL v. BRADLEY et al.

No. 5027.  Decided August 27, 1931.  (5 P. [2d] 230.)
Rehearing Denied November 17, 1931.

464

*Ingebretsen, Ray & Rawlins* and *Bagley, Judd & Ray,* all of Salt Lake City, for appellants.

*Gustin & Pence* and *J. W. Ensign,* all of Salt Lake City, and *J. H. Peterson,* of Pocatello, Idaho, for respondent.

STRAUP, J.

Henry Newell, a resident of Salt Lake City, Utah, died testate in May, 1928, leaving an estate of about $450,000. His wife, Rose Newell, died in 1918, about ten years before

his death. The controversy involves the question of whether the respondent was a surviving heir, and, if so, whether he was intentionally or unintentionally omitted from the will. The claim in such respect of William Henry Newell, Jr., an incompetent, the plaintiff and the respondent, is that he was a grandson of the testator; that no mention was made of him in the will and no provision therein made for him, and that he was unintentionally omitted from the will. All that was denied by the executor and legatees of the will.

The case was tried to a jury who, by a general and a special verdict, found the issues in favor of the incompetent, the plaintiff in the case. The court also made findings in harmony with the general and special verdicts and rendered judgment in favor of the plaintiff for a one-half interest in and to the estate and ordered the assets thereof to be so distributed. The defendants, the executor and legatees of the will, prosecute this appeal.

Numerous errors are assigned involving rulings of the court overruling the defendants' motions for a nonsuit and to direct a verdict, exceptions taken to portions of the charge to the jury, and rulings made in admitting and rejecting evidence. Assignments also are made with respect to the findings and conclusions of the court and the judgment.

The testator made two wills, one in 1922, the other March 6, 1925, which was admitted to probate in July, 1928. The validity of the will is not questioned. In March, 1929, the executor filed a final account and a petition for distribution praying that the assets of the estate be distributed to the legatees mentioned in the will and in accordance with its provisions. The legatees consist of about thirty or more nephews and nieces of the testator, children of his deceased sisters, and children of deceased sisters of his wife, to each of whom bequests of money were made. A bequest of $10 was made, as stated in the will, to one "William H. Newell now residing in New York City, who was raised in my

"family." A substantial devise was also made to trustees for the use and benefit of Harry N. Newell. The principal residue of the estate was then devised and bequeathed to trustees of Leland Stanford, Jr., University of Palo Alto, Cal., to be known as "The Henry Newell Scholarship" fund, for the use and benefit of young men and women of Utah, who attending such university show excellence in college work.

William Henry Newell, Jr., an incompetent (not the William H. Newell to whom the $10 bequest was made in the will), through his guardian ad litem, objected to and contested the distribution of the estate as prayed for by the executor and as provided by the will, on the alleged grounds that the William H. Newell to whom the $10 bequest was made was the illegitimate child and the only issue of the testator, Henry Newell, born out of lawful wedlock in New York City about the year 1876; that when William H. Newell was less than one year of age, Henry Newell received him in his family as his son with the consent of his wife and publicly acknowledged, treated, and regarded him as his legitimate child, and that thereby William H. Newell in law became the legitimate child of Henry Newell; that the contestant, William Henry Newell, Jr., was the son of William Henry Newell mentioned in the will, born in lawful wedlock in June, 1898, at Pocatello, Idaho, and the only issue of the marriage between William Henry Newell and Angie Rich in about 1896, and therefore he was the grandson and lawful heir of the testator Henry Newell; that William H. Newell, the father of William Henry Newell, Jr., died in February, 1924, about two years after the first will and about a year before the last will was executed, and about four years before the testator died; that the marital relation between William Henry Newell and Angie Rich Newell was dissolved in about 1901; that thereafter William Henry Newell remarried, and that Harry N. Newell was the lawful and only issue of that marriage, and thus was the half-brother of William Henry Newell, Jr., and a grandson of the testator; that William Henry Newell, Jr.,

and Harry N. Newell were the only surviving heirs of the testator when the last will of 1925 was executed and when the testator died; and that while Harry N. Newell was mentioned in the will and a substantial devise made to him, yet no mention was made in the will of William Henry Newell, Jr., and no provision therein made for him. Hence, the claim is made that he was unintentionally by the testator omitted from the will; and that he, therefore, under the statute (Comp. Laws Utah 1917, § 6341), was entitled to have distributed to him a one-half interest in and to the estate.

The executor and all of the legatees of the will denied all of the material allegations of the contestant, especially the allegations that William Henry Newell mentioned in the will was the illegitimate or legitimate son of Henry Newell, the testator, or that he had ever recognized or acknowledged him as his child, or that he was the father of William Henry Newell. In such particular it was in substance alleged by the defendants that William Henry Newell, when less than one year of age, was received in the family of Henry Newell and was reared until manhood by the testator and his wife, but that he was not the son of either the testator or of his wife; that he was merely received in their family and was reared by them, and as in effect stated by the testator in his will.

The defendants further alleged that in February, 1922, the testator executed and published his then last will and testament, which was in every respect identical with the will executed by him in March, 1925, except as to dates and a change made as to one of the trustees mentioned in the first will; that it was recited in the second will that the testator was satisfied with the first will in every particular, and that the only change made therein was as to one of the trustees mentioned in the first will; that when the first will was made, William Henry Newell, the alleged father of the contestant, was alive and was living in New York City; and that the same recital was contained in the first will as in the second as to the bequest made to

"William Henry Newell, now residing in New York City, who was raised in my family."

The jury by their special verdict found that William Henry Newell mentioned in the will was the illegitimate son of Henry Newell, the testator; that he was publicly acknowledged by him as his son and as such was received by him in his family with the consent of his wife; that William Henry Newell, Jr., the contestant, was the legitimate son of William Henry Newell mentioned in the will; and that the omission to mention William Henry Newell, Jr., in the will, or to provide for him by the testator, was due to "accident or mistake." The court also made findings and conclusions to the same effect, and adjudged and ordered the executor to distribute a one-half interest in and to the estate to the contestant William Henry Newell, Jr.

Henry Newell and his wife, Rose Newell, were married in New York City, where they then resided and where he was engaged in business. Several years after their marriage, and not having any children of their own, they, in New York City, took and received in their family William Henry Newell mentioned in the will when he was less than one year of age. Several years thereafter Henry Newell and his wife with the child left New York and went to Park City, Utah, where, and in Salt Lake City, they resided most of their married life and until the death of Rose Newell in 1918. In Park City Henry Newell for a number of years was engaged in the butcher and in the mining business. There William Henry Newell lived in their family until he was a young man and was married to Angie Rich at Coalville, Utah, in about 1896. They thereafter as husband and wife lived together at Pocatello, Idaho, where, in 1898, William Henry Newell, Jr., the contestant, was born as the only issue of the marriage. About two years after the birth of William Henry Newell, Jr., his father deserted Angie Rich Newell, and in 1901 she obtained a divorce from him. The child, William Henry Newell, Jr., remained in her custody and was supported by her. She remarried twelve or fifteen years prior to the

death of Henry Newell, the testator. Until then she lived most of the time in Pocatello with her parents. She, as she testified, made visits to Salt Lake City and to Park City where she had relatives and with the child on various occasions visited Henry Newell and his wife who, as she testified were fond of the child, called it their grandson, and purchased clothing and a baby cab for him. After her second marriage, she and her husband lived in Idaho, and in Salt Lake City for a year or more with the child, William Henry Newell, Jr., until about 1922 or 1923, when she and her husband with the child left Utah and went to California, where they ever since resided. William Henry Newell, Jr., in California, became an incompetent, and in 1928, before the death of the testator, was confined and ever since has been confined in the State Mental Hospital of California.

After the divorce, William Henry Newell, the father of the contestant, also remarried three or four different times. Harry N. Newell was the issue of one of such marriages, of the second marriage, and, so far as is shown by the record, was the only issue of any such subsequent marriages. His mother died when he was an infant about two years old. Henry Newell and his wife took him in their family and reared him. That an estrangement existed between Henry Newell and William Henry Newell before and after the death of Rose Newell and until the death of William Henry Newell is clearly shown by the record. The estrangement grew out of irresponsibilities and profligacies of William Henry Newell, and of demands made on Henry Newell for aid when William Henry Newell was in trouble. In 1922 and prior to the making of the first will, William Henry Newell, at Salt Lake City, wrongfully took from the possession of Henry Newell bonds, stocks, and other valuable securities and fled with them to New York City, where, until his death in 1924, he resided. He made the claim that such bonds, stocks, and securities belonged to Rose Newell, the wife of Henry Newell, and were her property at the time of her death in 1918, and that he was

the *natural and legitimate* son of Rose Newell, and thus claimed a half interest in such securities. The claim that he was the son of Rose Newell was wholly unfounded. Litigation followed between Henry Newell and William Henry Newell wherein, on a settlement, Henry Newell recovered back such securities.

The statute involved, Comp. Laws Utah 1917, § 6341, provides:

"When any testator omits to provide in his will for any of his children or for the issue of any deceased child, unless it appears that such omission was intentional, such child or the issue of such child must have the same share in the estate of the testator as if he had died intestate, and succeeds thereto as provided in the preceding section."

Neither the will of 1922 nor of 1925 made any mention of William Henry Newell, Jr., or made any provision for him, from which it is the contention of the contestant that a presumption arose that he was unintentionally omitted from the will. It is the contention of the defendants that inasmuch as it is alleged by the contestant that William Henry Newell, his father, was an illegitimate child of Henry Newell, it was essential for him to show that Henry Newell was "the natural father" of William Henry Newell; that he publicly acknowledged himself to be the father; and that he, with the consent of his wife, received William Henry Newell in his family and treated him as his legitimate child, to support which, In re *Robert's Estate,* 69 Utah 548, 256 P. 1068, and In re *Baird's Estate,* 182 Cal. 338, 188 P. 43, are cited. In re Robert's Estate this court held that both "natural parentage" and unambiguous acknowledgment of the relationship of father and child are essential to show heirship, and stated that:

"We are therefore of opinion that, in order to establish heirship under the statute, there must be satisfactory proof not only of acknowledgment of the relation of father and child, but satisfactory proof of the relation itself. Without such evidence we are of opinion a case of heirship under the statute is not established."

In accordance with such views it thus is the contention of the defendants that while there is sufficient evidence to show that William Henry Newell was taken with the consent of his wife into the family of Henry ■ Newell and by him acknowledged and treated as his child and as a member of his family, yet that the evidence was insufficient to show that Henry Newell was the natural father or parent of William Henry Newell; and that without such proof a case of heirship was not established.

In such respect the respondent proved by a witness that about 45 years prior to the death of Henry Newell, she, at Park City, had a conversation with a sister, since deceased, of Henry Newell, wherein the sister told the witness that Rose Newell, the wife of Henry Newell, told the sister that William Henry Newell was the illegitimate child of Henry Newell; and that on an occasion when Henry Newell and Rose Newell were still living in New York City, Rose Newell found the mother of William Henry Newell in the place of business of Henry Newell and "beat her up and threatened to kill her." Another witness called by the respondent testified that about 20 or 25 years prior to the death of the testator, Rose Newell, the wife of Henry Newell, told the witness that William Henry Newell was not her son, but was the son of Henry Newell, and that "he was forced on her." Another witness testified that the sister of Henry Newell told the witness about 45 years prior to the death of Henry Newell that William Henry Newell was not the child of Rose Newell but was the child of Henry Newell, and that his mother was a "New York girl." Another witness testified on behalf of respondent that about 47 years prior to the death of Henry Newell, Henry Newell told the witness that William Henry Newell was "his boy but did not belong to Rose," his wife. Another witness testified that about 44 years prior to the death of Henry Newell his sister told the witness that William Henry Newell was the child of Henry Newell but was not the child of his wife, Rose Newell. Other witnesses testified on behalf of respondent that Henry Newell referred to Wil-

liam Henry Newell as his son, called him his son, and to William Henry Newell, Jr., and to Harry N. Newell, as his grandsons. Other witnesses called by the respondent testified that William Henry Newell from infancy to manhood lived in the family of Henry Newell and his wife and was treated, maintained, educated, and cared for as their child. Some of the witnesses produced by respondent, testifying as to declarations made by the sister of Henry Newell, testified that the sister stated that Rose Newell abused and mistreated William Henry Newell when a young child, while other witnesses also produced by the respondent testified that Rose Newell well cared for him and treated him kindly.

The appellants gave evidence to show, also by declarations of others since deceased, that several years after the marriage of Henry and Rose Newell, they having no children, and when living in New York City, went to an orphanage or infants' home and there received William Henry Newell when an infant less than one year of age, a child of neither Henry or Rose Newell, and took him in their family, called him William Henry Newell, and cared for and raised him to manhood. In the controversy between Henry Newell and William Henry Newell with respect to the bonds and other securities, Henry Newell, in an affidavit or pleading in the cause, in 1921, deposed or averred that William Henry Newell was raised by him and his wife "from infancy, although he bore no relation to affiant or his wife and was never regularly adopted by either." One of the attorneys for Henry Newell and also an attorney for the defendants testified that in 1919 he had a conversation with William Henry Newell concerning his parentage in which he stated that he was told by Henry Newell that he was not his son, but that, in his opinion, he was the son of Rose Newell whose estate had not been probated, and that he was entitled to participate therein; that in 1921 or 1922 the attorney at Salt Lake City had another conversation over the telephone with William Henry Newell at New York City, concerning the bonds and securities, in which conversation William Henry Newell again stated that he was the son of Rose Newell and was

entitled to participate in her estate and that he would not surrender up any of the securities.

It further was shown that between 1919 and 1923, through relatives of Henry Newell and his wife Rose Newell, and through other sources, William Henry Newell made inquiry concerning his parentage. Following that, and in June, 1923, William Henry Newell at New York City wrote Henry Newell at Salt Lake City concerning such matters. He addressed Henry Newell as "Henry Newell, Dear Sir." Among other things he stated:

"Why don't you make some provision for me while I can derive a little pleasure out of life. You have plenty for yourself, don't be selfish. Think what your dear wife would have done if God had spared her. First, she would have cleared up this mystery; then she would have tried to provide for me, but she had a fear, as the last time I talked to her she said she would like to tell me something very important, but she seemed to lose her nerve. * * * God knows I have a great deal coming to me, after receiving the blow I did. You asked me to keep it quiet, but you did not do the same. You told it to the newspapers. Don't you think that hurt my feelings? Imagine yourself a man without a name, not knowing who his father or mother were. You don't realize the many unpleasant things I have come in contact with whereby I was called upon to give my parents' history. Not being able to do so, I have been turned down by bonding companies, and others, and lost the opportunity of gaining some good positions. This is not idle chatter, but goes to show you how it has affected me since 1919. I have had to accept positions where the pay was small, and no questions were asked, but that does not please me, I assure you. Ask anybody who is familiar with the method of a bonding company. Don't take my word. Then again, I have a peculiar feeling when I meet people, since you told me what you did."

The attorneys who acted for Henry Newell, and who at his request prepared both wills, testified that on divers occasions prior to and at the time of preparing the wills and of the signing of them, they inquired of the testator concerning his relatives and as to his intended legatees, and that in response thereto, he, among other things, stated that William Henry Newell mentioned in the will was not his son, nor the son of his wife, Rose Newell, and that he was

taken from an orphanage in New York City in his family and was reared by him. One of the subscribing witnesses testified that at the execution of the will similar inquiries were made and that in response thereto similar statements were made by the testator. The attorneys further testified that the testator told them that William Henry Newell had a boy by his first wife, and a boy, Harry N. Newell, by his second wife, and that William Henry Newell had three other wives, with one of whom he was then living. They further testified that in response to inquiries as to what children William Henry Newell had, the testator stated that he had two boys, Harry N. Newell, and "a boy by Angie Rich," but that he had not seen much of that boy, and that he "wasn't interested in Angie Rich's boy." They further testified that after Henry Newell told them that William Henry Newell was not related to him, they advised him that neither he nor Harry N. Newell or William Henry Newell, Jr., would take any of his property, unless he made specific provisions in the will for them, and that the testator in connection with that told them that "he wasn't interested in William Henry Newell, Jr., but was interested in Harry Newell."

The mother of William Henry Newell, Jr., testified that in November, 1927, she, at a hotel in Salt Lake City where the testator was living, saw him sitting in the lobby and walked over and shook hands with him; that he asked her how she was and where she was living; that she asked him if he remembered "my son Billy (William Henry Newell, Jr.), and he said 'Yes' and wanted to know what he was doing"; and that she told him he was an electrician working in Los Angeles.

Further evidence was given to show that a brother-in-law, since deceased, of Henry Newell, in response to an inquiry made in 1920 by another at San Francisco concerning William Henry Newell, wrote him that:

"In regard to the matter of W. H. Newell will say that I remember the day my wife went with Mrs. Newell to Randall Island and came home with the boy. He was always considered an adopted son. I never heard of his parents name and that is about all I know about him.

If there is anything further I can do in the matter, I will be pleased to do so."

Harry N. Newell, who at the time of the trial was about twenty-one years of age, testified that his mother, Bertha Norman Newell, died when he was about two years of age at Baker City, Ore., and that Rose Newell came to Baker City and brought him to Salt Lake City, where he made his home with Henry Newell and Rose Newell until her death in 1918; that they supported and maintained him, and that his father, William Henry Newell, had not contributed to his support and never communicated with him by mail or otherwise; that after the death of Rose Newell he lived at the hotel with Henry Newell and went with him on trips to Ocean Park, Cal.; that from about 1922 or 1923 he was with Henry Newell at the hotel at Salt Lake City and on trips to California almost constantly until his death, driving the automobile for him, reading newspapers to him, opening and reading mail to him, doing errands for him, and helping him in a general way; that he was not very well acquainted with his half-brother, William Henry Newell, Jr., but had seen him, had been with him and had some correspondence with him during 1923 or 1924; and that he read some of the letters he had received from William Henry Newell, Jr., to Henry Newell, the testator, who stated he was not interested in them. Other witnesses testified on behalf of the defendants to declarations made by members of the family since deceased that it was understood that William Henry Newell was not the son of Henry Newell or of Rose Newell and that he was received by them from an orphanage in New York City.

Further evidence was given to show that before or shortly after the death of Rose Newell and when Henry Newell was on trips to California, William Henry Newell a part of the time stopped at the hotel with Henry Newell and Harry N. Newell; that on other occasions, in 1920 or 1921, William Henry Newell, Jr., called on Henry Newell at his hotel in California and visited with him, and in 1918 attended the

funeral of Rose Newell and before and after that, from time to time, visited the testator at his apartments and at his hotel.

Harry N. Newell further testified that on occasions when he was living with Henry and Rose Newell and when William Henry Newell made demands on Henry Newell for financial aid, he heard conversations between Henry and Rose Newell wherein Henry stated to his wife that he was unwilling to extend any further aid to William Henry Newell as he was no relation of either Henry or Rose Newell. Harry N. Newell further testified that at about the time of the death of William Henry Newell, Henry Newell mentioned the fact to Harry N. Newell and talked about it. Also, one of the attorneys for Henry Newell testified that when the last will was made, Henry Newell stated that William Henry Newell had died more than a year prior thereto.

The testator, when the last will was made, was 81 years of age, his hearing and eyesight somewhat impaired. But no claim is made that his mind was impaired or that he was not possessed of all of his mental faculties.

Under the statute and on the record and as heretofore indicated, it is the contention of the defendants that while there is sufficient evidence to show that Henry Newell had publicly acknowledged William Henry Newell as his child and had received him in his family and treated him as his child, yet there is not sufficient evidence to show that Henry Newell was his "natural father"; and that the quantum of proof as to such fact did not meet the requirement stated in Re Robert's Estate, supra. That is based principally on the claim that the fact of illegitimacy, and that Henry Newell was the "natural father" of William Henry Newell, rests on mere declarations of deceased members of Henry Newell's family, including his own declarations, all made many years prior to his death, and that opposed to them is what is claimed to be direct evidence that Henry Newell was not the "natural father" of William Henry Newell; and hence the evidence was insufficient to submit the question to the jury, or on which to base a finding that Henry Newell was

the "natural father." The competency of the declarations is not questioned; but the sufficiency of them as against the claimed direct evidence is challenged and the claim made that they do not meet the requirements announced by this court that the fact of natural parentage must be established by "satisfactory proof."

There is very little direct evidence adduced by either party respecting the question of parentage. About all the evidence adduced by both parties is what may be termed indirect evidence. In the main, the defendants, to show that Henry Newell was not the "natural father" of William Henry Newell, sought to establish such fact by declarations of Henry Newell and of William Henry Newell made at or about the time of the execution of the first will and prior and subsequent thereto, and by declarations of others, which, as claimed, were more recent than the declarations shown by the respondent. We think that, however, goes more to weight of the testimony than to its competency, and that the declarations shown by the defendants did not dissipate the probative effect of the declarations shown by the respondent.

Though it be assumed that the preponderance or greater weight of the evidence shows that no such relation existed, yet, this being an action at law, if there is sufficient competent evidence to show the relation, the question was one of fact for the jury to whom the whole issue was tried and submitted. Assuming that repute alone is not sufficient to establish the fact of parentage, yet, here, in addition, were shown declarations of deceased members of Henry Newell's family, who presumably had knowledge of the facts declared that William Henry Newell was the illegitimate child of Henry Newell and some evidence that he himself in effect had so declared. In a case as here, where about all, who presumably had or could have had knowledge of the actual parentage, were dead, of necessity about the only way of making proof of such ultimate fact was by repute and by declarations of relatives of the reputed father, including his own declarations.

It thus is our opinion that with respect to such issue, the question was one of fact for the jury. And the jury was instructed that the respondent had the burden of proof to show that Henry Newell was the "natural father" of William Henry Newell, and that unless they so found they were required to render a verdict in favor of the defendants, notwithstanding the jury might find that Henry Newell publicly had referred to William Henry Newell as his son, had received him in his family with the consent of his wife, and otherwise had treated him as if he were a legitimate child.

A further point is made that on the face of the will it conclusively is shown or made to appear that the omission in the will to mention or provide for the respondent was intentional. That largely is based on the claim that whenever the mention of one person by a natural ■ association of ideas suggests another, it may reasonably be inferred that the latter was in the mind of the testator and was not forgotten or unintentionally omitted, or, as sometimes expressed, that when the testator names some person intimately connected with an unnamed heir, it may be evidence that such heir was not forgotten or accidentally omitted. A number of cases are cited by the defendants to support such view, or where such rule was so applied, or the will given such a construction, under statutes similar or analogous to our statute. *Pearce* v. *Pearce*, 104 Tex. 73, 134 S. W. 210; *Wilder* v. *Goss*, 14 Mass. 357, and prior Massachusetts cases therein cited; *Tucker* v. *City of Boston*, 18 Pick. (35 Mass.) 162; *Merrill* v. *Sanborn*, 2 N. H. 499; *Hockensmith* v. *Slusher*, 26 Mo. 237; *Woods* v. *Drake*, 135 Mo. 393, 37 S. W. 109; *Fugate* v. *Allen*, 119 Mo. App. 183, 95 S. W. 980; *Carver* v. *Wright*, 119 Me. 185, 109 A. 896; *Hawhe* v. *Chicago & W. I. R. Co.*, 165 Ill. 561, 46 N. E. 240; *Peet* v. *Peet*, 229 Ill. 341, 82 N. E. 376, 13 L. R. A. (N. S.) 780, 11 Ann. Cas. 492.

We do not say all of such cases fully support the contention of the defendants; some of them do; some were influenced by additional language of the will or by matters de-

hors the will; and some, where such matter was regarded as mere evidentiary value, but not of a conclusive nature.

On the other hand, there are cases cited by the respondent to the contrary, or which repudiated or did not give such conclusive effect to the rule as contended for by the defendants and as shown by some of their cited cases. In re *Atwood's Estate*, 14 Utah 1, 45 P. 1036, 60 Am. St. Rep. 878; *Roots* v. *Knox*, 107 Or. 96, 212 P. 469, 213 P. 1013; *Riley* v. *Collier*, 111 Okl. 130, 238 P. 491; *Spaniard* v. *Tantom*, 131 Okl. 75, 267 P. 623; *Gray* v. *Parks*, 94 Ark. 39, 125 S. W. 1023; In re *Salmon's Estate*, 107 Cal. 614, 40 P. 1030, 48 Am. St. Rep. 164; In re *Ross' Estate*, 140 Cal. 282, 73 P. 976; *Gage* v. *Gage*, 29 N. H. 533; *Meyers* v. *Watson*, 234 Mo. 286, 136 S. W. 236; *Williams* v. *Roberts* (Mo. Sup.) 187 S. W. 19; *Chicago, B. & Q. R. Co.* v. *Wasserman* (C. C.) 22 F. 872; 1 Page on Wills, § 492, pp. 804-805; Alexander Comm. on Wills, § 636, p. 956; 1 Jarman on Wills, 465; 18 C. J. 841.

Such cases in the main support the respondent's contention, at least to the extent that such matter so appearing on the face of the will is not of such controlling or conclusive character as to justify a ruling, or a construction of the will, of an intentional omission, especially where, as in this jurisdiction, the intention of the testator in such particular is to be determined not alone by the will, but also by evidence dehors the will.

The question in each instance involves the intention of the testator as to whether he intentionally or unintentionally omitted to provide for any of his children or the issue of any deceased child, and who, had the testator died intestate, had the lawful right to share in his estate. In some jurisdictions it is held that such intention is to be ascertained alone from the language of the will when considered altogether, and that the immediate circumstances or conditions surrounding the making of the will or other matters dehors the will may be resorted to only to aid an ambiguity of the will, either latent or patent.

In this jurisdiction *(Coulam* v. *Doull,* 4 Utah 267, 9 P., 568, affirmed 133 U. S. U. S. 216, 10 S. Ct. 253, 33 L. Ed. 596, and In re *Atwood's Estate,* 14 Utah 1, 45 P. 1036, 60 Am. St. Rep. 878) the rule, under our statute and in other jurisdictions under similar statutes, is that whether the testator intentionally or unintentionally omitted to provide for or mention any child or issue of a deceased child is to be determined, not alone from the language of the will, but also by extrinsic evidence and proof of collateral facts, including declarations of the testator. In such respect this court, as well as other courts under similar statutes, held that where a child of the testator or the issue of a deceased child was omitted from the will and no provision made for him, a presumption arose that he was omitted unintentionally, or through mistake or by accident, but which presumption was rebuttable by proof of extrinsic evidence and collateral facts. Under the statute it thus is clear that such omitted heir does not share in the estate of a testator when it appears, either by the will, or by evidence dehors the will, or by both, that the omission was intentional. Language of a will and bequests and devises may be of such character as to lead to but one conclusion, that all others except those mentioned in the will were intended to be excluded. Such is well illustrated by the cited case of *Hawhe* v. *Chicago & W. I. R. Co.,* supra, where no mention was made of any of the children of the testator, and where he devised and bequeathed all of his estate, real, personal, and mixed and of every kind, whatsoever, to his wife, giving her full power and authority to collect and pay all debts, sell any and all of the estate, real and personal, and convey the same by bill of sale and by deed of conveyance, as fully and completely as the testator could have done in his lifetime. In such case, and as the Illinois court held, language could not have been used which would more clearly express an intention that the wife and she alone was to take and hold the testator's estate to the exclusion of all others including his children.

Here, so far as appears on the face of the will, is presented a somewhat different situation. Though from matters so appearing by the will it be assumed that an inference may be deduced that the respondent was intentionally excluded from the will and that it was the intention of the testator not to devise or bequeath him anything, yet we think no such conclusive inference or deduction is warranted on the face of the will alone. The argument is that since the testator made a bequest, though of a mere nominal sum, to William Henry Newell, the father of the respondent, and a substantial devise to Harry N. Newell, the grandson of the testator and a half-brother of the respondent, the mention of such persons and by a bequest and devise made to them, by a natural association of ideas must also have suggested the respondent, and hence that he also must have been in the mind of the testator, and thus was not forgotten, but was intentionally omitted. Whatever force there may be to the argument, yet we think it and the deduction consists of mere inferences of more or less evidentiary value, but do not in and of themselves so conclusively show an intentional omission as to require a directed verdict in favor of the defendants on such theory. When the last will was made, the one admitted to probate, William Henry Newell, the father of the respondent, had been dead for more than a year. Had he then been alive the respondent would not have been an heir, and hence no occasion to mention him in the will in any way. The father, however, being dead when the will was made, the mention of him in the will was not a mention of the respondent (In re *Ross' Estate*, supra; Alexander Comm. on Wills, § 636, p. 956), and though such circumstance be considered as an inference tending to show that it was the intention of the testator not to provide for the respondent, yet in and of itself was not of such conclusive character as to require, as is contended, that the verdict be directed on such ground.

The defendants, however, further contend that though the respondent was the grandson and an heir of the testator, though the testator by his will omitted to provide for him,

though on the face of the will it is not conclusively shown that the respondent was intentionally omitted, and though in the absence of evidence to the contrary the presumption created by the statute be indulged that he was unintentionally omitted, yet, by the evidence adduced by the defendants that the respondent was intentionally omitted, the presumption was dissipated; and the respondent adducing no evidence to refute the evidence so adduced by the defendants, they, as they claim, were entitled to a directed verdict in their favor. The stated proposition is sound, providing the evidence adduced by the defendants respecting the intention of the testator to intentionally not provide for the respondent is so direct and conclusive as not to admit of a finding to the contrary. The respondent, while he adduced evidence to show that William Henry Newell was the illegitimate son of Henry Newell, was publicly acknowledged and held out and treated by him as his son and as such had taken him in his family and reared him with the consent of his wife, that the respondent was the legitimate son of William Henry Newell and the grandson of the testator and that no provision was made for him by the will, yet, gave no evidence tending to show that the omission was unintentional or through mistake or by accident, and as proof of such fact, relied alone on the presumption created by the statute. That the evidence adduced by the defendants tended to show that the omission to provide for the respondent was intentional may not well be doubted. When evidence was thus so adduced and sufficient to support a finding that the omission was intentional, the presumption ceased and the question of the intention of the testator was, independently of the presumption, required to be considered and determined on all the evidence adduced on the subject or question, including all reasonable and proper inferences to be deduced therefrom.

Thus, the point is: Was the evidence when so considered, independently of the presumption, of such character as to justify a finding that the omission was unintentional, or so as to permit a finding either way on the proposition?

484

In determining that, it is necessary to consider the office of the presumption—both parties called it a presumption and courts speak of it as a presumption—created by the statute. It applies in all cases falling within the terms or conditions mentioned in the statute, and thus is a presumption of law. It is founded upon the policy of the law that children, heirs of a testator, are regarded with favor, and on a natural presumption against disinheriting them. The statute has been construed by this court, and the same construction given similar statutes by other courts, to the effect that where the testator omitted to provide for his child or children, or the issue of any child or children, a presumption arose under the statute that the omission was unintentional or through mistake, forgetfulness, or accident, unless it is made to appear either by the will itself, or by extrinsic evidence or by both, that the omission was intentional.

When, therefore, it was shown by the respondent that William Henry Newell, the father of the respondent, was the inheritable child of the testator but who had been dead more than a year when the last will was made revoking all prior wills, that the respondent was the legitimate child of William Henry Newell and the grandson of the testator and was not provided for by the will, and that he and Harry N. Newell, at the time of the making of the will and at the death of the testator, were the only surviving heirs, and it not appearing on behalf of the respondent's evidence that the omission was intentional, a legal presumption by reason of the statute arose that the omission was unintentional or through mistake or by accident, casting the duty on the defendants to go forward with evidence to show or tending to show that the omission was intentional; and if the defendants did so, and adduced sufficient evidence to warrant or justify a finding that the omission was intentional, which the respondent desired to refute or rebut, the duty of again going forward with evidence shifted back to the respondent. When, however, the facts and circumstances were shown concerning which the pre-

sumption was indulged, the presumption ceased, and the controversy was to be decided upon the evidence adduced independently of the presumption. In other words, the presumption was not itself evidence and had no weight as evidence. It, in the absence of evidence concerning which it was indulged, only made a prima facie case for the respondent in whose favor it existed, and pointed out the party who first had the duty of going forward with evidence with respect thereto. To that effect are the decisions of this court. *Ryan* v. *Union Pacific R. Co.,* 46 Utah 530, 151 P. 71; *State* v. *Steadman,* 70 Utah 224, 259 P. 326; *Clark* v. *Los Angeles & S. L. R. Co.,* 73 Utah 486, 275 P. 582, and *State* v. *Green,* (Utah) 6 P. [2d] 177. Such, too, is the general rule. 1 Jones, Comms. on Evidence, pp. 74, 75; 4 Wigmore on Evidence, §§ 2491 and 2511; Thayer, Law of Evidence, pp. 314-339; 22 C. J. 156; *Lincoln* v. *French,* 105 U. S. 614, 26 L. Ed. 1189; *Nicholson* v. *Neary,* 77 Wash. 294, 137 P. 492; *Rock Island Plow Co.* v. *Balderson,* 26 S. D. 399, 128 N. W. 482; *State ex rel. Detroit Fire & M. Ins. Co.* v. *Ellison,* 268 Mo. 239, 187 S. W. 23; *Frank* v. *Wright,* 140 Tenn. 535, 205 S. W. 434; *Glassman* v. *Harry,* 182 Mo. App. 304, 170 S. W. 403; *Modern Woodmen of America* v. *Kincheloe,* 175 Ind. 563, 94 N. E. 228, Ann. Cas. 1913C, 1259; Id. (Ind. App.) 93 N. E. 452; *Potts* v. *Pardee,* 220 N. Y. 431, 116 N. E. 78, 8 A. L. R. 785; *Cleveland, C. C. & St. L. R. Co.* v. *Wise,* 186 Ind. 316, 116 N. E. 299; *Colangelo* v. *Colangelo,* 46 R. I. 138, 125 A. 285; *Peters* v. *Lohr,* 24 S. D. 605, 124 N. W. 853, 855. The rule is well stated in the case of *Peters* v. *Lohr,* supra, as follows:

"A presumption is not evidence of anything, and only relates to a rule of law as to which party shall first go forward and produce evidence sustaining a matter in issue. A presumption will serve as and in the place of evidence in favor of one party or the other until prima facie evidence has been adduced by the opposite party; but the presumption should never be placed in the scale to be weighed as evidence. The presumption, when the opposite party has produced prima facie evidence, has spent its force and served its purpose, and the party then, in whose favor the presumption operated, must meet his opponent's prima facie evidence with evidence, and not presump-

tions. A presumption is not evidence of a fact, but purely a conclusion."

The respondent does not dispute, but concedes, that the presumption was not itself evidence and may not be weighed as such and that it in the first instance but took the place of evidence. What in such particular chiefly divides the parties is this: By the defendants it is contended that they, by direct evidence which, as they claim, was not refuted or rebutted by the respondent, proved that the omission to provide for the respondent was intentional and hence they on such issue were entitled to a directed verdict in their favor; by the respondent, that the evidence so adduced by the defendants was not direct or positive, at most but .indirect, some of which more or less conjectural, parts of some of which in conflict with other parts, and some where the credibility of witnesses was affected by motives and interests, and hence on all the evidence adduced, including all reasonable inferences to be deduced therefrom and bearing on the issue, it was not so clearly and conclusively established that the omission was intentional as to justify a direction of the verdict on such ground in favor of the defendants, but that the question on all the evidence adduced was one of fact for the jury. That the evidence so adduced by the defendants was sufficient to justify a finding that the omission was intentional, we have no doubt. That it was so conclusive as to require a direction of the verdict in favor of the defendants on such ground, is another question. We are not impressed with the argument of the respondent, and think it unsound, that the defendants, to overcome the presumption created by the statute, were required to establish that the omission was intentional by clear and convincing proof, or by indisputable evidence, or by facts and circumstances which "excluded every reasonable hypothesis of an unintentional omission." The presumption ceased to exist when sufficient evidence was adduced to justify or warrant a finding that the omission was intentional. In other words, when the duty arose requiring the defendants to go forward

with evidence, all they were required to do to overcome the presumption, or more properly speaking to cause the non-existence of the presumption, was to prove facts and circumstances concerning which the presumption was indulged and which justified or tended to justify a finding contrary to the presumption.

The evidence so adduced by the defendants may thus be summarized: Before or at about the time the first will was made and upon inquiries as to the children of William Henry Newell, the testator referred to and mentioned Harry N. Newell, and the respondent by referring to him as "Angie's boy," the first wife of William Henry Newell, or as "Angie's Willie." The testator did that on several occasions. The respondent's mother, called as a witness by the defendants, testified that the respondent on several occasions visited the testator and his wife at their apartments in Salt Lake City, that he attended the funeral of the testator's wife, that afterwards he from time to time visited the testator at his apartments and at the hotel where he was then living, that in 1920 or 1921 he visited the testator at his hotel in California and in 1923 again visited the testator at his hotel in Salt Lake City. She further testified that in 1923 and 1924, Harry N. Newell, in Salt Lake City and living with the testator, corresponded with the respondent in California; that in 1927 she herself visited the testator at the hotel where was living and in a conversation had with him he stated that he remembered her "son Billie," the respondent, and inquired what he was doing and remembered that she was the first wife of William Henry Newell. Another witness testified to statements made by the testator several years before his death of his receiving a letter from "Angie's boy Will," the respondent. The testator's attorneys who prepared the will testified to statements made by the testator on several occasions that he had received letters from "Angie's boy." It also was shown that the mother of Harry N. Newell died when he was an infant and that he was taken into the family of Henry Newell and his wife and was reared by them, and from about 1922 or

1923 and until the death of the testator, Harry was almost constantly with him, driving the automobile for him, opening and reading his mail to him, and otherwise caring for and helping him; that in 1923 and 1924 Harry, at Salt Lake City, corresponded with the respondent in California, of which the testator had knowledge; that on such occasions when Harry wrote to the respondent the testator was asked if he desired to say anything or have anything said for him, to which the testator replied that he did not; that when letters were received from the respondent some of them were addressed on the envelope "Henry Newell" and the letters themselves to "Dear Grandpa and Harry"; and that all letters so received were given or read to the testator and that in connection therewith he stated that he was not interested in them and in some instances directed the letters thrown in the waste basket. The attorneys who drew the will for the testator further testified that at a number of conversations had with the testator as to his property and relatives, he told them on several occasions that William Henry Newell was not his son and not related to him, except that he was taken into his family and was reared by him; that William Henry Newell had two sons, one by his first wife to whom he referred as "Angie's boy," and Harry, a son by the second wife; that on such information the attorneys advised the testator that William Henry Newell would not, nor would any of his children, take any of his property, unless special provision was made in the will for them and that in response thereto the testator replied he had not seen much of "William Henry, Jr.," or of "Angie's boy," the respondent; that he "was not interested" in him, but was interested in "Harry"; and that the testator told them that on several occasions and each time the subject-matter came up in response to inquiries concerning his heirs and relatives and as to whom he wanted to participate under the will and as to the persons or relatives he desired to have included in the will.

On the face of the will it is apparent that by the mere nominal bequest made to the father of the respondent it

was the clear intention of the testator not to make any provision for him. And it further was shown that at the time and before the first will was made a strained relation existed between William Henry Newell and the testator. It also was shown that notwithstanding when the second will was made the testator knew William Henry Newell had been dead for a year or more, yet the same nominal bequest of $10 was made to him by the second will as was made by the first, and that the second will in all respects was identical with the first, except as to the nomination of one of the trustees with whom the testator had become dissatisfied, and that in all other respects it was his wish to have both wills the same.

Now, it is the contention of the defendants that when the evidence heretofore referred to was adduced by them, the presumption created by the statute ceased and in no sense could be considered or weighed as evidence, and inasmuch as the respondent offered no evidence to refute or rebut the evidence so adduced by the defendants, in effect relied only on the presumption to support a finding of an unintentional omission to provide for the respondent, and since on the evidence so adduced but one finding is permissible, that of an intentional omission, the defendants were entitled to a directed verdict. We think the contention must prevail. Certain it is that on the evidence adduced a finding was justified that the omission to provide for the respondent was intentional. In such case it is just as certain that the presumption created by the statute had fully spent its force and could not be considered as evidence or be weighed against that adduced by the defendants. We, after much reflection, are further persuaded that without the aid of the presumption, a finding based alone on the evidence adduced that the omission was unintentional or "by accident or mistake" was not permissible. On the evidence so adduced by the defendants, we do not find any substantial conflict, as is urged by the respondent, nor do we see any basis for any claimed motive or interest affecting credibility of the witnesses, or which, for such reason or for any other reason,

would justify a jury in disbelieving or disregarding their testimony. Whether one-half of the estate of the testator is or is not distributed to the respondent in no way, as made to appear, affects or disturbs the devise made to Harry N. Newell, or affects his pecuniary interests, or that of any other witness testifying in the case, except perhaps the indirect interest of the respondent's mother who was a witness called by both the respondent and the defendants. Not anything is made to appear that any of the witnesses was hostile, prejudiced, or biased, or that his testimony was improbable. Though some of the conversations had with the testator and his counsel and as to statements made by him to them concerning "Angie's boy," and as to conversations had and transactions related between the testator and Henry N. Newell, were not in the presence of any other person, and though no direct evidence may have been available to the respondent to refute such statements, yet not anything is made to appear to discredit such witnesses or to render their testimony improbable. True, the jury are the judges of the credibility of witnesses and the weight to be given their testimony, nevertheless they may not arbitrarily reject testimony, or disbelieve witnesses or disregard their testimony, when not impeached or contradicted or discredited, or if the testimony is not improbable and no reasonable ground appearing that it is false or unworthy of belief. We therefore are of the opinion that the court at the conclusion of the evidence erred in overruling the defendant's motion for a directed verdict on the ground just stated.

There is another question of importance which in a large measure involves the same principles of law just considered with respect to the presumption. In charging the jury, the court in substance charged that if the jury found that the respondent was the grandson of the testator, then because of the statute, which the court in substance stated to the jury, the respondent was entitled to share in the estate of the testator as though he had died intestate, unless it was made to appear that the testator intentionally omitted to provide for him; "and you are

further instructed that the law raises a presumption that the omission is not intentional and such presumption must be rebutted by a preponderance of the evidence showing that such omission was intentional." Complaint is made of the charge in such particular. The respondent first urges that the exception thereto was too general and did not sufficiently indicate the particular matters now complained of, and further defends the charge on the ground that it was not open to the criticism made of it. We think the exception was sufficient to entitle the defendants to a review of the charge. The principal complaint made of it is that the court thereby conveyed the thought to the jury that the presumption was itself evidence, or had evidentiary value which could be considered and weighed against whatever evidence may have been adduced tending to show that the omission to provide for the respondent was intentional, or at least in such respect was misleading and confusing, which led to the prejudice of the defendants. We think the charge at least to a great extent is open to the complaint. If it did not directly convey the thought to the jury that they could consider the presumption as evidence, it at least tended to give the jury the impression that in considering whether the evidence adduced respecting an intentional omission did or did not preponderate against or over the presumption, the jury were permitted to consider and weigh the presumption against such adduced evidence. What we have just said as to the office and function of the presumption, that when evidence is adduced respecting facts and circumstances concerning which the presumption is indulged the presumption ceased and could not be considered of evidentiary value, it necessarily follows that the charge is erroneous and prejudicial. In the case of *State* v. *Green* (Utah), 6 P. [2d] 177, just decided, we had under consideration a somewhat similar charge which was held misleading and erroneous because it permitted the presumption there involved after it had been dissipated by evidence adduced of facts and circumstances concerning which the presumption related, to be considered and weighed as evidence in determining

the ultimate fact concerning which the presumption was indulged. What we there said on the subject that when evidence is adduced of facts and circumstances concerning which the presumption is indulged, the presumption ceased and could not be considered or weighed as evidence, applies here. Had the evidence adduced by the defendants, though not controverted by the respondent, been of such character that in considering it reasonable minds might well differ as to whether the respondent was or was not intentionally omitted from the will, then the question ought to have been submitted to the jury with proper instructions that upon their finding that the respondent was an inheritable heir and was omitted from the will and no provision made for him, the burden of proof was cast on the defendants to establish the fact that the omission was intentional, and if they have not done so they must fail as to such issue; but that in determining it, the jury were required to determine it upon the evidence adduced and without considering the presumption of any evidentiary value whatever. We think the charge did not meet such requirement.

Thus though it be assumed that the evidence respecting the question of the testator's intention in not providing for the respondent was of such character as to require a submission thereof to the jury, we think the court erred in the charge, and because thereof, but more particularly of the overruling of 'the defendants' motion for a directed verdict on the ground heretofore stated, the judgment of the court below must be reversed and the cause remanded for a new trial.

Having reached such conclusion, it is proper that we also consider further assignments, since some of the questions involved may again arise on a retrial. Some fifteen or sixteen of the assignments relate to rulings admitting or excluding testimony pertaining to various subjects. We do not say the rulings are all erroneous; at any rate, not of such harmful effect as to require a reversal of the judgment on such ground.

After one of the attorneys who had prepared the will, on direct examination on behalf of the defendants, had testified as to the conversations had with William Henry Newell concerning his parentage, and what he and the testator with respect thereto had stated to the witness, ■ the respondent on cross-examination of the witness, over the objection of the defendants, was permitted to put in evidence a letter written by William Henry Newell in 1920, to the law firm of which the witness was a member, wherein William Henry Newell, among other things, stated that he referred to a written statement of a physician who had made a physical examination of the testator in July, 1920, and wherein the physician referred to "an irritation of the brain" of the testator, by reason of which, William Henry Newell in his letter inquired what, if any, effect such condition had on papers signed by the testator. We think such matter was improperly received. It in no particular related to anything testified to by the witness on his direct examination; it was hearsay and not within the exception to the hearsay rule relating to pedigree, or within any other exception to the rule; nor did it relate to any subject within the issues, nor was there any claim made by the respondent or by any one that the mind of the testator was impaired or that he was not in full possession of his faculties. The ruling may have been harmful.

Again, after one of the attorneys who had prepared the will, on direct examination on behalf of defendants, had testified that the testator had told him that William Henry Newell was not his son, the witness on cross-examination was shown a telegram which the witness admittedly had sent to William Henry Newell wherein the witness ■ stated that "your wire to your *father* was received," and that it was "his order that you deposit" in a bank in New York City all papers and securities, etc., and if "you do that *your father* will feel all right about it," etc. The telegram was received in evidence as part of the cross-examination of the witness. No complaint is made of that. But on redirect examination the witness, on behalf

of the defendants whose witness he was, was asked to explain the conditions and circumstances under which and how it was that he, in the telegram, referred to the testator as the "father" of William Henry Newell. On the objection of the respondent the witness was not permitted to do so. We think the ruling wrong. The court ought to have given the witness the right and an opportunity to explain the apparent inconsistency by whatever reasonable and pertinent explanation he had to offer. 2 Wigmore on Evidence, § 1044; Jones on Evidence, Civil Cases, § 852; *West* v. *Smith*, 101 U. S. 263, 25 L. Ed. 809; *Weber* v. *Della Mountain Min. Co.*, 14 Idaho 404, 94 P. 441. Without the explanation the jury, because of the apparent inconsistency, may have rejected the testimony of the witness given on his direct examination, but with an explanation may not have done so; and thus the ruling may have been of harmful effect.

Again, one of the attorneys who prepared the will having testified as to the manner in which the testator had referred to "Angie Rich's boy," the respondent, and that he was not interested in him, in that connection was asked by counsel for the defendants in what manner the testator had referred to Harry N. Newell, the half-brother of the respondent. Over the objection of counsel for the respondent, the witness was not permitted to answer. We think the court erred in that. The sought inquiry was rejected on the theory that as Harry was a legatee and his right under the will not questioned, his relation to the testator and how Harry was regarded or may have been referred to by the testator was immaterial. The defendants were permitted to show that the testator stated that he was interested in Harry but was not interested in "Angie's boy," the respondent. What additional matter was sought by the further inquiry is not made to appear, except as may be implied by the questions propounded to which objections were made and sustained. However, from the questions propounded it is conceivable that the sought inquiry had some relevancy and bearing on the circumstance of the testator making provision for Harry and not for the

respondent and as to whether the failure to provide for the respondent was intentional and not through forgetfulness or mistake. Had the questions been permitted to be answered, it might have been shown that the testator did not regard either Harry or the respondent as his heir, nevertheless was desirous of making some provision for Harry because the testator had reared him, in his declining years was closely associated with him, and had an affection for him, while no such conditions or relations existed as to the respondent, and for such reason the testator was not disposed to make any provision for him.

The other assignments seem to be of little consequence, and while mentioned in the brief, yet are so scantily referred to and discussed as almost to preclude a review of them.

Thus, for the reasons heretofore stated, the judgment of the court below is reversed and a new trial granted. Costs to the appellant.

ELIAS HANSEN, FOLLAND, and EPHRIAM HANSON, JJ., concur.

CHERRY, C. J.

I concur in the result.