[No. 8061. *En Banc.* May 18, 1910.]

# H. S. JACKSON, *as Administrator etc., Respondent,* v. DAVID LAMAR *et al., Appellants.*[1]

DEEDS — EXECUTION — VALIDITY — MENTAL CAPACITY—EVIDENCE— SUFFICIENCY. The evidence is insufficient to show mental incapacity to execute a deed, where it appears that the parties to the deed were brothers, who had lived together as bachelors and accumulated considerable property held by them in common under an agreement that the first to die should execute a deed to the survivor to avoid a testamentary disposition of the property, that the deed was executed the day after the grantor was taken to a hospital suffering from an illness from which he died a month later, that three witnesses present at the time clearly established that he fully understood the nature of the business, and the only evidence to the contrary being that of nonexperts as to the grantor's appearance during his stay at the hospital.

DEEDS—DELIVERY—EVIDENCE—SUFFICIENCY. Possession of a deed by the grantee raises a strong presumption of delivery, which is not overcome by the evidence of an extreme partisan, disappointed in not receiving a portion of the estate granted, who testified, seven years after the occurrence and several years after the death of both parties to the deed, that the grantor, who was on his deathbed at the time and had executed a deed to his brother, pursuant to a previous agreement, directed the notary to take care of the deed until he called for it, which he would do as soon as he got well; the notary having testified that the grantor executed the deed in order, as he stated, that his brother should have the estate in case of his death.

MORRIS, FULLERTON, and PARKER, JJ., dissenting.

Appeal from a judgment of the superior court for Walla Walla county, Brents, J., entered November 27, 1908, upon the verdict of a jury rendered in favor of the plaintiff, in an action to recover possession of real property and to quiet title. Reversed.

[1]Reported in 108 Pac. 946.

*Sharpstein & Sharpstein* and *James H. Hull,* for appellants.

*Rader & Barker, Gose & Gose,* and *James W. Boyd,* for respondent.

RUDKIN, C. J.—James C. Lamar and Joseph Lamar, his brother, lived for many years in Walla Walla county, where they accumulated real and personal property of considerable value, which they held in common. The brothers never married, but lived together in bachelor quarters, at a place called Lamar Station. It appears that James C. Lamar, the elder brother, was strongly opposed to making a testamentary disposition of his property, fearing that his will would be contested and overthrown after his death. To avoid such a contingency, the two brothers had an agreement or understanding between themselves that whichever one should die first would convey his interest in the common property to the survivor before the end came. On the 4th day of October, 1901, James C. Lamar was taken to St. Mary's hospital at Walla Walla, suffering from some malady the nature of which is not disclosed by the record.

On the 10th day of October, 1901, he executed a deed of the property now in controversy in favor of his brother Joseph Lamar, pursuant to the agreement above referred to, and thereafter died intestate on the 11th day of November following. On the 24th day of October, 1907, the plaintiff was appointed administrator of his estate, and by this action sought to recover the property described in the above deed, from the grantees of Joseph Lamar. From a judgment in favor of the plaintiff, this appeal is prosecuted.

The rights of creditors are not involved, and if the deed of October 10, 1901, was valid as between the parties, the judgment of the court below is erroneous and must be reversed. The validity of that deed is challenged on two grounds: (1) because of mental incapacity of the grantor at the time of its execution, and (2) for want of a valid delivery. At the

date of the execution of the deed, the grantor was eighty-five years of age, and was suffering from the illness or disease that caused or resulted in his death about a month later. There was considerable testimony tending to show that the grantor was weak, had no expression in his face, did not care to talk, was indifferent and unconcerned, was not competent to attend to ordinary business, and the like, during his stay in the hospital. This testimony all came from nonexpert witnesses, some of whom at least manifested no little bias in favor of the respondent. Their testimony was based on appearances only. They testified to no act or statement of the grantor tending to show that his mind was unbalanced, or that he was bereft of reason. The appearances and conditions described by these witnesses were not at all unusual when we consider that the grantor was an eccentric old man, on his deathbed. On the other hand, the testimony of the two witnesses who were present at the execution of the deed shows clearly and convincingly that the grantor was then in full possession of his faculties, and understood the nature and quality of his act and the business in hand. Their testimony is strongly corroborated by the signature to the deed, and by a witness for the respondent who claims to have appeared on the scene at the moment of the transmission of the deed. The latter witness testified that the grantor gave certain instructions as to the final disposition of the deed, showing clearly that he fully understood the nature of the business under consideration. The respondent relies largely on the testimony of this witness to show a nondelivery of the deed, and if the grantor had sufficient mind and memory to give these instructions, he also had sufficient reason and intelligence to enable him to execute and make an absolute delivery of the deed. On the entire record, we are convinced that the judgment cannot be sustained on the ground of mental incapacity on the part of the grantor at the time of its execution, for there is no substantial testimony in the record tending to establish that fact.

The circumstances attending the execution and delivery of the deed are these: The deed was prepared by, or at the instance of, the grantee, who informed one Max Baumeister of the agreement between himself and his brother, and requested him to go to the hospital and procure the deed. Baumeister repaired to the hospital and had a social talk with the grantor for a few moments, after which he informed the grantor of his mission and of the agreement with his brother relating to the final disposition of their property. The grantor admitted that such was their agreement, and stated that he was ready and willing to execute the deed. The deed was thereupon signed by the grantor before Baumeister and one Blanchard as witnesses, and acknowledged before Baumeister as a notary public. The deed was then handed to Baumeister, who returned to his office and delivered it to the grantee. After the death of the grantor, the deed was returned to Baumeister for the purpose of having it recorded. The mere possession of a deed by the grantee carries with it a strong presumption of delivery which can only be overcome by clear and convincing evidence. *Tunison v. Chamblin,* 88 Ill. 378; *Richmond v. Morford,* 4 Wash. 337, 30 Pac. 241, 31 Pac. 513; 1 Devlin, Deeds (2d ed.), § 294.

The evidence relied upon to show a nondelivery is the following: Baumeister testified:

"A. I just went into the room and afterwards I got social with him for perhaps a few minutes, had a social chat with him, and then I questioned him regarding that deed and what Joe had told me, and he admitted that that was the case and that he was ready to sign and willing to sign, and he did sign. Q. And that is all there was to it? A. Yes; of course, he said that Joe and he had had an understanding to that effect, and he wanted Joe to have the interest in it in case he passed on, to keep him from being annoyed by the heirs in the East."

Mrs. DeGruchy, a witness for the respondent, testified:

"A. I left the room, and after awhile my attention was called that Mr. Baumeister was going, and I went to see if

their business was concluded, and I heard Mr. Lamar say, as best he could, he spoke up and said, 'Take care of the deed until I shall ask you for it, which I will as soon as I get well.' And Mr. Baumeister said: 'Very well, James, I will take care of it.' "

Also:

"Q. I will ask you, Mrs. DeGruchy, speaking of the conversation that you had with James C. Lamar, how soon was that after Mr. Baumeister went out of the room? A. One of the sisters came in and gave him a stimulant, and after the medicine had comforted him, then he told me that he had deeded his land to Joseph after his life, but not until I am dead; and I said, 'What then, James?' 'Then,' he said, 'it must go back to Missouri to the poorer portion of my relatives.' "

A special interrogatory was submitted to the jury, embodying the substance of the testimony of the last named witness first above mentioned, but the jury were unable to agree upon an answer. There is nothing whatever in the testimony of the witness Baumeister tending to defeat the operation of the deed. The mere statement of the grantor that he wanted his brother to have his interest in the property in case he passed on, to keep him from being annoyed by the heirs in the East, has no tendency to establish a nondelivery of the deed or to overcome the presumption arising from its possession by the grantee. The conversation referred to the agreement between the brothers and not to the delivery of the deed. If, therefore, the deed was not delivered, the fact of nondelivery must rest on the testimony of Mrs. DeGruchy, and if her testimony is sufficient, if believed, to show a nondelivery, the case must be remanded for a new trial, because the special finding of the jury shows that the general verdict was not based on her testimony or on the statements she attributed to the deceased grantor, and there is no other theory upon which the judgment can be sustained. If, on the other hand, the testimony of this witness was incompetent or is insufficient as a matter of law to show a non-

delivery of the deed, a final judgment should be directed by this court. It may be that the grantor did not intend to divest himself of all his property during his lifetime, or that he expected to recall the deed in the event of his recovery; but are we permitted to speculate as to his probable intentions? Does not the law, on grounds of public policy, attach certain consequences to his overt acts against which his intentions cannot prevail?

In *Gilbert v. North American Fire Ins. Co.,* 23 Wend. 44, approved by this court in *Richmond v. Morford, supra,* the court said:

"If the grantor do not intend that his deed shall take effect until some condition is performed, or the happening of some future event, he should either keep it himself, or leave it with some third person as an escrow, to be delivered at the proper time. If he deliver it as his deed to the grantee, it will operate immediately, and without any reference to the performance of the condition, although such a result may be contrary to the express stipulation of the parties at the time of the delivery. This is one of the cases in which the law fails to give effect to the honest intention of the parties, for the reason that they have not adopted the proper legal means of accomplishing their object."

See, also, *Dyer v. Skadan,* 128 Mich. 348, 87 N. W. 277, 92 Am. St. 461; *Darling v. Butler,* 45 Fed. 332, 10 L. R. A. 469; *Duncan v. Pope,* 47 Ga. 445; *Ordinary v. Thatcher,* 41 N. J. L. 403, 32 Am. Rep. 225; *Hubbard v. Greeley,* 84 Me. 340, 24 Atl. 799, 17 L. R. A. 511. And delivery to an agent designated or appointed by the grantee to receive the deed is a delivery to his principal. *Ordinary v. Thatcher,* and *Hubbard v. Greeley, supra.*

Under these authorities it is extremely doubtful whether a grantor may make the grantee the depositary of his deed for any purpose or, if he does, whether the law will not give full effect to the deed contrary to his intentions. But, if we concede that the testimony of this witness was sufficient to defeat the deed, if believed, it is not the clear, convincing proof that the law exacts in such cases. The jury was not

satisfied with the truth of her testimony. The witness was sorely disappointed because she did not receive a portion of the estate herself, and was an extreme, if not a bitter, partisan. She was attempting to give the details of a conversation that occurred more than seven years before, and her testimony was denied by other witnesses. It seems to us that such testimony as this is utterly insufficient to defeat a deed seven years after it has been given over to the grantee, and several years after the death of both parties to the instrument. As said by the court, in *Tunison v. Chamblin, supra*:

"When a deed, duly executed, is found in the hands of a grantee, there is a strong implication that it has been delivered, and only clear and convincing evidence can overcome the presumption. Otherwise, titles could be easily defeated, and no one could be regarded as being secure in the ownership of the land. It cannot be that a grantor may assail a conveyance fifteen or twenty years after a deed has been made, and recover the land by merely swearing he never delivered the deed. The unsupported evidence of a grantor surely cannot be permitted to have such effect, especially when the evidence of such a grantor is, in many material matters, contradicted, and he seems to act on a low moral plane. To so hold would render all titles insecure, and would be disastrous in the extreme. Any system of jurisprudence, adopting rules for the attainment of justice, can never sanction a rule fraught with such unjust and iniquitous results."

Believing, therefore, that the deed under which the appellants claim is valid in all respects, the judgment of the court below must be reversed, with directions to dismiss the action. It may be that the law does violence to the immediate intentions of the grantor in this case, but his ultimate intentions are given sway. Reversed and remanded.

CROW, DUNBAR, CHADWICK, and MOUNT, JJ., concur.

MORRIS, J. (dissenting)—I dissent. As suggested in the majority opinion, the main questions involved in this appeal are, (1) the sufficiency of the evidence to establish mental

incapacity of the grantor at the time of the execution of the deed, and (2) its delivery. Upon the allegation of mental incapacity, it was not necessary to show an entire loss of mental power. It was, however, in the absence of any undue influence, necessary to show that, at the time of the execution of the deed, October 10, 1901, the mind of James C. Lamar was in such a feeble condition, arising from either mental or physical weakness, that he could not, and did not, understand the nature, character, and consequences of his act. This, however, under the issues, was a question of fact for the jury, and we should not disturb their verdict if there is substantial evidence to support it.

Where there is evidence tending to support a given contention, its weight is for the jury. James C. Lamar entered the hospital October 4; the deed was executed October 10, and he died November 11. During all this time he was a very sick man, and a number of persons who saw him during that time gave their opinion as to his mental capacity, based upon what they then and there observed. This evidence was received without any objection as to its competency or the competency of the witnesses, and the jury had a right to consider it. I refer to some of this evidence:

"He didn't have any expression in his face at all; he was too weak; he didn't care for anything; . . . he was unconcerned; he didn't pay any attention to any one; . . . he just looked as if he was about through with; he didn't care to talk; you could see that he was giving out; he was not capable of attending to any business; . . . he didn't have any use of his body; he was too weak to raise his hands; he was just a weak, worn-out man; . . . he was very weak; he seemed to be prostrated and languid; he seemed to be growing weak, and he didn't seem to be in his right mind, and he didn't seem like himself some way; . . . it seemed that his mind wandered, and he didn't seem his old self at all; it was difficult for him to talk; his speech seemed to be thick; he couldn't get his voice; he didn't seem to have control of his voice; . . . he seemed to have a vacant expression; he didn't seem to be natural; . . . he was growing weaker all the time; he was

swollen all over; his bowels were awfully swollen; he couldn't stand the cover on his bowels; his feet, hands and arms were swollen; his limbs were helpless; . . . he would be lying there apparently unconscious, couldn't lift his hands to his mouth, couldn't handle a spoon, couldn't get anything out of him. It does not seem that he was ever capable of attending to business; his mind was perfectly blank; could not get anything out of him; don't know whether his mind wandered or not; seemed to be blank; he lay with his eyes closed and, when he looked out of them, they were wild."

Other witnesses gave it as their opinion that he was capable of understanding and appreciating what was going on. With such evidence submitted to the jury under proper instructions, I cannot say there was no substantial evidence to justify the verdict. It is true that the evidence, outside of the opinions given, is largely of his physical condition; but there was sufficient to justify the jury in finding that his mind was in such a feeble condition from his bodily infirmities that he had no understanding or appreciation of the character and extent of his act at the time of the signing of the deed.

The second question submitted to the jury was as to the delivery of the deed. To substantiate this contention, respondent relied mainly upon the testimony of Mrs. DeGruchy, who testified that she came to Mr. Lamar's room just as Mr. Baumeister, who had brought the deed to the hospital and taken Mr. Lamar's acknowledgment to it, was leaving, and she heard Mr. Lamar say: "Take care of the deed until I shall ask you for it, which I will as soon as I get well," and Mr. Baumeister said: "Very well, James, I will take care of it." If the jury believed this testimony, it is apparent to my mind there was no delivery of the deed. Mr. Baumeister does not anywhere in his testimony specifically deny this testimony of Mrs. DeGruchy, although he does inferentially by detailing all the conversation he had with Mr. Lamar, which does not include what Mrs. DeGruchy testified to having heard. He says:

"I just went into the room and afterwards I got social with him for perhaps a few minutes—had a social chat with him, and then I questioned him regarding that deed and what Joe had told me, and he admitted that that was the case, and that he was ready to sign and willing to sign, and he did sign. Question: And that is all there was to it? Answer: Yes. Of course, he said that Joe and he had had an understanding to that effect, and he wanted Joe to have the interest in it in case he passed on, to keep him from being annoyed by the heirs in the East."

Mrs. DeGruchy also testified that she was in the room just prior to Mr. Baumeister's coming in; while Mr. Blanchard, a witness to the deed, says he was there before and after its signing, and there was no one else present except Baumeister; that he did not hear what was said, as he was hard of hearing; all that he heard was Mr. Lamar asked him to sign the deed as a witness. Baumeister also says Blanchard was the only other person present at the time. The jury was requested to make a special finding, covering this phase, and instructed to answer "Yes" or "No." The finding submitted to the jury was as follows:

"Question: Did James C. Lamar, at the time he gave the deed in question to Max Baumeister, say to Baumeister, 'Take care of the deed until I shall ask you for it, which I will as soon as I get well;' or words to that effect; and did Max Baumeister there say to James Lamar, 'Very well, I will take care of it and you can have it when you want it,' or words to that effect? Answer: We, the jury, cannot agree to answer the above question by 'Yes' or 'No.' "

It is, therefore, impossible to say what the belief of the jury was as to that conversation; whether they meant by their answer that they were divided, or whether there was some qualification. They did not answer it, and hence it can have no bearing one way or the other. It is difficult to see what effect it could have had upon the general verdict, in case they had answered it. It was by no means a special verdict or finding of any ultimate fact in the case; it was simply

an attempt to discover what the view of the jury was as to this item of evidence, which in my judgment was not proper. Questions submitted to a jury should be restricted to ultimate facts upon which the rights of the parties directly depend, and should not relate to mere evidentiary facts. 20 Ency. Plead. & Prac., 330.

"However natural the curiosity parties may have to know the precise course of reasoning by which jurors arrive at verdicts either for or against them, they have no right, under guise of submitting questions of fact to be found specially by the jury, to require them to give their views upon each item of evidence and thus practically subject them to a cross-examination as to the entire case." *Chicago & N. W. R. Co. v. Dunleavy*, 129 Ill. 132, 145, 22 N. E. 15.

"It is the controlling fact or facts that should be ascertained by the special finding and not the testimony establishing these facts." *Adams' Adm'r. v. Louisville & N. R. Co.*, 82 Ky. 603.

I cannot, therefore, hold, as contended for by appellants, that the failure of the jury to answer this interrogatory in the affirmative should be taken as a finding on their part that James C. Lamar and Max Baumeister did not have the conversation attributed to them by Mrs. DeGruchy; nor, as contended by the majority, that the verdict was not based upon her testimony. The general verdict is susceptible of a finding that it did occur, and showed a plain purpose and intent on the part of James C. Lamar that the deed was not then to be delivered to Joseph Lamar, but was to be kept subject to his control.

It needs no citation of authority to establish the law to be that there is no delivery of a deed until the grantor has so dealt with it as to lose control and dominion over it. There can be no delivery until there is a surrender of possession by the grantor, either absolute or conditional; absolutely, if the effect of the deed is to be immediate and the title to pass; conditionally, if the operation of the deed is to be postponed or made dependent on the happening of some subsequent

event, in which case the delivery can be made by placing the deed in the hands of some third person to be retained by him until the happening of the event. But even in such a case, it is an essential characteristic and indispensable feature that there must be a parting with the possession and with all control and dominion over it. *Prutsman v. Baker*, 30 Wis. 644, 11 Am. Rep. 592; *Osborne v. Eslinger*, 155 Ind. 351, 58 N. E. 439, 80 Am. St. 240; *Porter v. Woodhouse*, 59 Conn. 568, 22 Atl. 299, 21 Am. St. 131, 13 L. R. A. 64; *Hoffmire v. Martin*, 29 Ore. 240, 45 Pac. 754; *Fisher v. Hall*, 41 N. Y. 416; *Cook v. Brown*, 34 N. H. 460; *Walter v. Way*, 170 Ill. 96, 48 N. E. 421. In this connection I quote the testimony of Baumeister above set out, to the effect that James C. Lamar, at the time of the signing of the deed, said "he wanted Joe to have an interest in it *in case he passed on*, to keep him from being annoyed by the heirs in the East."

This evidence, coupled with the fact that five days after the death of James C. Lamar this deed was filed for record at the request of Baumeister, was a circumstance from which the jury were justified in believing that James C. Lamar never intended to surrender the control of that deed, nor to part with the title to his property until his death; and that his very purpose in making the deed was to have it take the place of a will. This view is strengthened by the testimony of Harvey Shaw, a witness for appellant, who testified that he had a conversation with James C. Lamar, in which he told him "he had better make up his mind about his property, and he (Lamar) said that this man Senator Tilden made a will, and they broke it, and it is of no use for a Missourian like me to make a will. As far as the property was concerned he said that, if he died first, he wanted Joe to have it, and that Joe could settle with them Missourians."

John Hoffman, another witness for appellants, testified to talking with James C. Lamar about making a will, in which conversation Lamar said: "That is no way to do; that is not the way I am going to do; I am going to give a

deed to the man that I want to give it to my brother or my brother will give it to me. That is the way to do; it is more substantial, for the lawyers get so smart; if you make a will, they always find a loophole in it, and they will throw it out of courts, and your will will not go through." This evidence was offered by appellants to show it was the intention of James C. Lamar to give his property to his brother Joe; but it was also evidence to show, and under the instructions of the court the jury were justified in believing it showed, an intention on the part of James C. Lamar not to part with the possession and title to his property until his death, and then have his deed take the place of a will. In other words, it was his intention, at the time he signed the deed, to make a disposition of his property of a testamentary character, which would take effect, not in his lifetime, but at his death. Such being the case, there was no delivery, and the deed could not operate as a will unless it was executed with all the statutory formalities pertaining to wills. *Cline v. Jones,* 111 Ill. 563; *Bovee v. Hinde,* 135 Ill. 137, 25 N. E. 694; *Walter v. Way,* 170 Ill. 96, 48 N. E. 421; *Allen v. De Groodt,* 105 Mo. 442, 16 S. W. 494, 1049; *Patterson v. Snell,* 67 Me. 559.

The judgment should be affirmed.

Fullerton and Parker, JJ., concur with Morris, J,