## CHAMBERLAIN et al v. LARSEN et al.

No. 4994. Decided February 7, 1934. (29 P. [2d] 355.)

*Romney & Nelson,* of Salt Lake City, for appellants.

*William Reger,* of Salt Lake City, for respondents.

EPHRAIM HANSON, Justice.

This is an appeal from a judgment of the district court of Salt Lake county vacating and annulling a deed signed and acknowledged by Sadie B. Bennett, now deceased, purporting to convey to Josephine Fortune, also now deceased, certain premises, which deed the court found was never delivered, but was, after the death of Sadie B. Bennett, recorded in the office of the county recorder of Salt Lake county, Utah, and therefore constitutes a cloud upon the title of the heirs of said Sadie B. Bennett. By its decree the court further

adjudged the defendants to have no interest in said property, and adjudged the plaintiffs and the heirs of said Sadie B. Bennett to be the owners in fee simple thereof, subject to administration.

Sadie B. Bennett and Josephine Fortune were sisters, and the property in question consisted of about an acre of land in the southeast part of Salt Lake City, with a house thereon, in which the two made their home. It formerly belonged to a brother, George Bennett, who died in August of 1919, and Miss Bennett obtained title to the same by deed from George Bennett dated June 12, 1916, and recorded August 27, 1919. George Bennett and his sister Sadie were both unmarried, and about 1903 she came to Utah and lived with her brother until his death in August of 1919. Upon the death of her brother, Miss Bennett sent for her sister, Mrs. Fortune, who was a widow, and the two from that time lived together upon the property until the death of Miss Bennett which occurred January 15, 1928, and Mrs. Fortune continued to reside thereon until her death March 29 of the same year. January 24, 1928, a deed dated January 27, 1921, from Miss Bennett to Mrs. Fortune, purporting to convey the property in question, was duly filed for record, and it is this deed which the trial court annulled upon the ground of nondelivery. February 22, 1928, Mrs. Fortune suffered an accidental injury which completely disabled her and she sent for the defendants Mr. and Mrs. Larsen, who, at her request, then went to live with and care for her. On March 2, 1928, she executed a deed conveying the property in question to the defendants, but reserving a life estate therein, and defendants entered into an agreement to care for and support Mrs. Fortune.

Miss Bennett and Mrs. Fortune were both well advanced in years, the former having passed the age of 70 at the time of her death, and the latter the age of 82. The plaintiffs are nieces and nephews of Miss Bennett, and, of course, also of Mrs. Fortune, and they prosecute this action on behalf of themselves and all the heirs of Miss Bennett.

The respondents have interposed a motion to strike the bill of exceptions upon the ground that the same "was not served, settled or allowed within the time required by law or order of the court." The bill of exceptions was settled on stipulation on January 15, 1930, long after the period allowed by statute had expired, but the time for serving and settling the bill of exceptions had, by orders seasonably made by the court, been extended up to and including January 15, 1930. These orders appear in the transcript, and by Comp. Laws Utah 1917, § 6867, as amended by Laws Utah 1925, c. 52, are part of the judgment roll. The bill of exceptions was settled in due time. The motion to strike is denied.

In their assignments the appellants specify some 45 alleged errors which they group in five divisions, as follows:

"1. Error of the court in overruling defendant's demurrer to plaintiff's complaint, and in overruling defendant's objection to the introduction of any evidence.

"2. Error of the court in denying motion for non-suit.

"3. Error of the court in overruling defendants' objection to the introduction of certain evidence and exhibits.

"4. Error of the court in making its findings, individually and collectively, its conclusions and its judgment.

"5. Error of the court in denying defendants' motion for new trial."

In support of their first group of specifications of error, appellants urge that the complaint did not state a cause of action and that plaintiffs have not the capacity to sue because there has been no adjudication of heirship; that the plaintiffs are not all the heirs of the decedent; and that the administrator of the estate of said decedent was not a party to the action. We find no merit in this contention. Upon the death of the decedent, the title to any property of which she died possessed immediately passed to and vested in her heirs, subject to administration and the payment of debts. The purpose of an adjudication of heirship is not to vest title, but to adjudicate where the title of

the decedent has already vested. Regardless of whether there had been an adjudication of heirship, the rights of heirs can be asserted or defended in any proper manner. The pleadings did not disclose that there were other heirs or that an administrator had been appointed for the estate of the decedent. Neither by demurrer nor answer did the defendants raise the objection that there was a defect of parties, and such objection, if any there were, was therefore deemed waived. Comp. Laws Utah 1917, § 6573.

The controlling question for determination in this action was whether the plaintiffs had succeeded in establishing the nondelivery of the deed from the decedent to Mrs. Fortune. For this purpose they showed that on January 23, 1928, eight days after the death of Miss Bennett, Mrs. Fortune went to the safety deposit vault of Zion's Savings Bank & Trust Company and sought access to the safety deposit box there rented in the names of Sadie B. Bennett and Josephine Fortune. On account of the death of Miss Bennett, the Attorney General of the state required that an inventory of the contents be taken when the box was opened. The contents of the box were then examined and the following were inventoried by the custodian:

"One abstract No. 26369, one will, one abstract No. 11855, one assignment of mortgage, one note $1000 Albert J. Linnell, one first mortgage Tracy Loan & Trust Co., one assignment of mortgage $3000, one note $850 signed Esther Shively, one warranty deed, Josephine Fortune, one note Mary O. Griffin $900."

The warranty deed there listed is the one the delivery of which is in question. .

This was not a complete inventory of the contents of the box. On cross-examination the custodian testified: "We don't take an inventory of anything which isn't of any value," and that he did not remember the order in which the papers were laid in the box, that he could not recall whether a certain billfold then exhibited to him and containing the marriage certificate and other papers belonging

to Mrs. Fortune was in the box, nor whether any of the papers were in the folder.

A party who desires to gain access to a safety deposit box is first required to sign an "admittance slip," the party is then admitted to the vault, unlocks and removes the box, and retires with it to a private room or booth. For the purpose of showing that Miss Bennett only had access to the box from the time of the signing of the deed up to the date of her death, and that she by such token had not delivered the deed to Mrs. Fortune but had retained possession of it, a number of such admittance slips bearing the signatures of Miss Bennett were produced, and two others bearing the signatures of Mrs. Fortune were also received showing that twice on January 23, 1928, Mrs. Fortune had gained access to the box. The custodian further testified that on most occasions the two old ladies came together, that the slip would be signed by one of them, that while at the bank they were always together, and together they retired to the private booth taking the box with them. He, of course, had no knowledge of what occurred in the private booth.

J. Fletcher, Jr., testified that on June 5, 1928, he, as administrator of the Sadie B. Bennett estate, and Vernon Romney, as administrator of the Josephine Fortune estate, visited the bank and withdrew all papers then in the box and released the box. That Mr. Romney took the abstract of title to the property involved in this action, also a document purporting to be the last will and testament of George E. Bennett. The other papers were retained by Mr. Fletcher. Mr. Fletcher testified that he had "two sets of mortgage papers" taken from the box, and which he did not produce. He produced a bundle of 18 other papers which plaintiff introduced in evidence for the purpose of showing "by a sort of a process of elimination that Josephine Fortune had no papers there." These papers consisted of letters, bills, insurance policies, and miscellaneous papers, many of which appeared to have belonged to either George E. Bennett or Sadie B. Bennett, and some few of which bore no indication of

ownership. Among these was the Esther Shively note for $850, listed in the inventory, payable to the A. Richter Company and indorsed by it, also the Tracy first mortgage note for $500 indorsed by it. Of the papers listed in the inventory, one abstract, the first mentioned assignment of mortgage, the Linnell note, and the Griffin note were unaccounted for, except as some of them may have been included in the two sets of mortgage papers retained by Mr. Fletcher. Of the bundle of 18 papers so introduced in evidence, only the two notes were listed in the inventory.

The deed in question was prepared by and acknowledged before Mr. Fletcher as a notary. He also signed as a witness. Mr. Fletcher, although a member of the bar, is engaged in the real estate and insurance business, being at one time connected with the A. Richter Company, and later with the Fletcher Lucas Company. At the time the deed was executed an assignment of a mortgage held by Miss Bennett was also prepared by Mr. Fletcher and signed and acknowledged by Miss Bennett. Regarding this, Mr. Flentcher testified: "Miss Bennett wanted the deed made out and an assignment of the mortgage to her sister to take care of any future trouble in the event Miss Bennett died before Mrs. Fortune." Miss Bennett suffered from diabetes, though Mr. Fletcher was unaware of the fact at that time. He further testified that the two ladies came to him together, that the two were almost inseparable, that Mrs. Fortune suffered from defective eyesight and hearing and was thereby incapacitated from doing business and that Miss Bennett did most of the talking; that he was not sure, but to the best of his recollection after taking the acknowledgments to the deed and assignment of mortgage the papers were handed by him to Miss Bennett. It was further shown that fire insurance on the property in question was carried in the name of George E. Bennett until September of 1921, and thereafter in the name of Sadie B. Bennett. Mr. Fletcher testified that when insurance was once written it would be renewed from period to period, and that he aimed to carry the insurance in the

name of the "record owner." It was also shown that two years later Miss Bennett executed a release of the mortgage covered by the assignment to Mrs. Fortune. The record is silent as to the circumstances under which the release was executed, or who received the money.

Mr. Fletcher and several others testified to numerous conversations with Miss Bennett after the signing of the deed in which she expressed a desire to sell the property. Mrs. Fortune participated in some of these conversations, some were with Miss Bennett alone. It is also in evidence that the taxes on the property for the years 1921 and 1927 were paid by Miss Bennett.

Mr. and Mrs. Waller and their two daughters seem to have been on intimate terms with Miss Bennett and Mrs. Fortune. They were all called as witnesses for the plaintiffs, and from their testimony it is made to appear that Miss Bennett and Mrs. Fortune during the time they lived together were almost inseparable; that Miss Bennett, the younger of the two, was more energetic and did the business for the two; that Miss Bennett often said if she died first the property went to Mrs. Fortune, and if Mrs. Fortune died first, she would have to make other arrangements; that she often stated the place was too large for them to care for and she would like to sell part of it; that Mrs. Fortune participated in such conversations stating that it was too much for them to care for and they would like to sell it. From the testimony of one of the daughters, it is made to appear that immediately after the death of Miss Bennett the witness and Mrs. Fortune were looking for the burial clothes for Miss Bennett in the place where Miss Bennett had told the witness they were kept, but the clothes were not to be found. When asked for a conversation regarding the property, the witness, after reciting the unsuccessful search for the burial clothes, stated: "She was so upset, so nervous, she just walked the floor with the coal oil lamp in her hand, and she said, 'What will I do?' I said, 'There is nothing to do, Josie, just stay here in your house.' She said, 'Is it my house?' I said, 'Yes.' She said,

'How do you know?' I said, 'Sadie told me that if Sadie died first the property went to you.' She said, 'I never knew this. Sadie never told me that the property went to me.'"

Other members of the Waller family testified to similar statements by Mrs. Fortune. There is also the testimony of an undertaker that the day following the death of Miss Bennett, in discussing the question of funds to pay funeral expenses, he asked whether there was an estate, and Mrs. Fortune stated that she did not know whether it was going into an estate or whether it was deeded to her or deeded to some one else.

Mrs. Waller also testified to a request made by Miss Bennett in November of 1927, about two months prior to her death. It is not clear from her testimony just what this request was. She testified: "Sadie, if anything happened to her, she asked me if I would go with Josie and have her deed transferred." When asked, "Transferred or recorded," she replied, "Well, recorded, I guess." Again when asked, "And have the deed recorded," she answered, "She didn't say a deed, she said to have the legal matters you know, to have * * * what there was to do, if I would go with Josie to have it attended to." Later, when interrogated regarding her former testimony, she said: "I don't know whether I said that or not, I can't remember whether Sadie said that. She asked me if I would go with Josie and do her business for her." Again when asked if the request was "to have the deed recorded," she replied: "I think that is the exact words she said." That Miss Bennett in that conversation also said: "I couldn't tell Josie, she wouldn't understand if I did tell her."

Mr. Larsen testified in his own behalf. He and his wife had performed many neighborly acts of kindness for Miss Bennett and Mrs. Fortune, and at the request of Mrs. Fortune he went with her to the bank on January 23, 1928, following the death of Miss Bennett. According to his testimony, when the contents of the box were being examined, a certain red leather billfold was lifted up and a paper which proved to be the deed in question fell out of it. That the

attendant who was taking the inventory looked inside the bill fold and said, "That is a marriage certificate" or a death certificate, "It is of no value." That after the inventory was completed the box and its contents were handed to Mrs. Fortune and he accompanied her into the private booth, where, after opening the billfold she looked around on the floor and exclaimed "My deed!" and he suggested, "Maybe that is the paper that fell out of it." That she then took up the top paper which proved to be the deed, put it in her purse, and left.

Mr. Romney, administrator of the Fortune estate, identified the billfold and its contents as being in the box on June 5, 1928, when he and Mr. Fletcher removed the contents of the box. The certificate therein was the certificate of the marriage of Archibald Fortune and Josephine Bennett at Chesterfield, New York, June 11, 1873.

Another witness for defendant, a neighbor owning adjoining property and who seems to have been an intimate acquaintance of Miss Bennett and Mrs. Fortune, testified that Sadie (Miss Bennett) had several times "told me she had given Josie (Mrs. Fortune) a deed for the place, and all she had to do after her death was to put it on record." Being asked on cross-examination if the statement was not that Sadie had made the deed, he answered: "She told me she had given Josie a deed for the place and all she had to do was the same as she did, go and have it recorded."

On February 22, 1928, Mrs. Fortune fell from a ladder and was seriously injured. She sent for Mr. and Mrs. Larsen, the defendants herein, who then went to care for her. A physician called to attend her testified that after he had prescribed for her she requested him to close the door, stating that she wanted to talk to him regarding her property. That she then said she had known Mr. and Mrs. Larsen for some time, that they had been friends of hers and her sisters, that he had rendered many services helping her and her sister, looking after the property, keeping up the fences and one thing and another like that; that because of his kindness she

and her sister had decided that when they died they would like to leave the home to Mr. and Mrs. Larsen, and whatever money they had to Larsen's little girl; that she wanted to have a notary public fix it up so that if anything happened to her as a result of the sickness she was going through, Mr. and Mrs. Larsen would get the property; that before her sister Sadie died she had given her a deed to the property and that she had that in a safety deposit box; and that this had been given to her by her sister Sadie before she died. That when they made the deed it was understood that when she (Mrs. Fortune) died, it would go to Mr. and Mrs. Larsen. That she had some relatives in the East who had been writing to her of late in regard to her property; that she cared nothing for them because they had never shown any interest in her whatever; and that she would like it fixed up so that these relatives would not be able to come in and cause any trouble and prevent Mr. and Mrs. Larsen from having the property. That he explained to her that it would be necessary for her to have it done properly in a legal way, or else he (Larsen) would be beaten out of it in all probability. He offered to, and did procure for her an attorney who drew up the required papers, including the deed conveying the property to the Larsens but reserving to Mrs. Fortune a life estate, and the agreement of the Larsens to maintain, care for, and support Mrs. Fortune during the remainder of her life, residing with her or apart from her as she might desire, care for and keep the property in a good state of repair, paying all taxes, assessments, and other charges thereon, and upon her demise to pay all funeral expenses, etc. The sufficiency of the consideration is not open to question, and it appears that the Larsens have fully performed their agreement.

This being an action in equity, upon appeal the cause is in effect tried de novo in this court upon the record made in the lower court, and for this reason we have set forth with considerable particularity the evidence of both parties. We will now consider the alleged errors in

overruling defendants' objections to the introduction of evidence.

The evidence so admitted over defendants' objections consisted of (1) the admission slips bearing the signatures of the persons having access to the safety deposit box, and introduced to prove that decedent was the only person having access to the box from the signing of the deed until after her death; (2) other papers introduced as tending to show that only papers belonging to the decedent were kept in the box; (3) satisfaction by decedent of the mortgage covered by the assignment which was signed by her at the same time that she signed the deed in question; (4) evidence of the acts, conduct, and declarations of the decedent with reference to the property after the signing of the deed; and (5) evidence of declarations by Mrs. Fortune made shortly after the death of Miss Bennett tending to show that at that time she did not claim to own the property.

There was no error in receiving the admittance slips in evidence. Any evidence tending to show that the decedent was the only person having access to the place where the deed was shown to be after her death was admissible on the issue of nondelivery. The objection urged by appellants that it has been shown that both the grantor and the grantee had access and right of access to the box, and it is therefore immaterial which signed the admittance slips, goes to the weight, rather than the admissibility of the evidence.

We think the court erred in admitting in evidence the papers found in the box on June 5, 1928, when the same were removed from the box by the administrators of the two estates, "to show by a sort of a process of elimination that Josephine Fortune had no papers there." Mrs. Fortune had access to the box on January 23, 1928, when it was opened and the inventory taken and when she removed the deed. The custodian testifies that she had access to it a second time that same day. She also had access at least once more when she replaced the deed therein

after it had been recorded. If on June 5th a large number of other personal belongings of Mrs. Fortune had been found in the box, it would have been no evidence that they were there prior to the death of Miss Bennett. The use or nonuse by Mrs. Fortune after the death of Miss Bennett was not evidence of such use or nonuse prior thereto.

We also think the court erred in admitting in evidence a release by Miss Bennett of a mortgage covered by an assignment of the mortgage to Mrs. Fortune made at the same time as the deed. This was a collateral matter with which the defendants were not concerned, and the delivery or nondelivery of the deed was not affected by the delivery or nondelivery of the assignment of the mortgage. Could it be successfully contended that absolute proof of the delivery of the assignment of the mortgage would prove or tend to prove the delivery of the deed? We think not. Equally must it be held that the nondelivery of the assignment of the mortgage would not prove or tend to prove the nondelivery of the deed. Nor do we think that the release of the mortgage by the record holder thereof is much if any evidence of the nondelivery of the unrecorded assignment thereof, particularly in view of the relationship existing between the assignor and the assignee.

The court committed no error in admitting evidence of the acts, conduct, and declarations of Miss Bennett in reference to the property, made after the date of the deed. Where, as in this case, the issue is whether the grantor named in the deed had ever parted with her title, evidence that the alleged grantor, after the signing of the deed, continued to pay taxes, carried the insurance in her own name, and offered to sell a portion of the property, was admissible on the issue of intention to deliver the deed.

Nor did the court err in admitting evidence of declarations made by Mrs. Fortune after the death of Miss Bennett tending to show that at that time she did not claim to own the property and that she had no knowledge of the existence of the deed in question.

The serious question in this case is as to the sufficiency of the evidence to sustain the, finding of nondelivery of the deed in question. Yet, for another reason, regardless of what the answer may be to this question, the decree appealed from must be held erroneous. By this decree ■ the court adjudged the defendants to have no interest in the property and adjudged the plaintiffs and heirs of Sadie B. Bennett, deceased, to be owners thereof in fee simple, subject to administration. The court, in effect, has thus annulled not only the deed from Miss Bennett to Mrs. Fortune, but also the deed from Mrs. Fortune to the defendants. Let it be assumed that the deed from Miss Bennett was never delivered, yet must it be admitted that upon her death her sister Mrs. Fortune was an heir and succeeded to an interest in whatever property Miss Bennett owned at the time of her death. Just what that interest would be we do not know, as the record is silent as to who are the heirs of Miss Bennett, except as it is made to appear that Mrs. Fortune was a sister, and the plaintiffs' nieces and nephews. Such interest she had the absolute right to dispose of. By the deed which she executed and delivered to defendants, whatever interest she had is now vested in the defendants. The decree adjudging the defendants to have no interest in the property, must be reversed to that extent, in any event.

Let us now consider the sufficiency of the evidence to support the finding of nondelivery. Necessarily the burden of showing such nondelivery was upon the plaintiffs who alleged that the deed though recorded had never ■ been delivered. The rule seems to be well settled that a deed duly executed and acknowledged and shown to be in the possession of the grantee is self-proving both as to execution and delivery, and that the recording of a deed is likewise evidence of delivery. It is thus stated in Devlin on Deeds (3d Ed.) § 294:

"The possession of a deed, duly executed, in the hands of the grantee, is prima facie, but not conclusive, evidence of its delivery. It therefore follows that he who disputes this presumption has the

burden of proof, and must show that there has been no delivery. And not only must this presumption be overcome, but it is held that there is such a strong implication that it has been delivered when it is found in the hands of the grantee that only strong evidence can rebut the presumption."

This rule is well supported by the decisions. See cases cited by Devlin, also the following more recent cases: *Heavner* v. *Kading*, 209 Iowa 1275, 228 N. W. 313; *Jones* v. *Betz*, 203 Iowa 767, 210 N. W. 609, 213 N. W. 282; *Wilson* v. *Wilson*, 83 Neb. 562, 120 N. W. 147; *Id.*, 85 Neb. 167, 122 N. W. 856; *McFarland* v. *Brown* (Mo. Sup.) 193 S. W. 800; *Crutcher* v. *Stewart* (Mo. Sup.) 204 S. W. 18; *Shoptaw* v. *Ridgways Admr*, 60 S. W. 723, 22 Ky. Law Rep. 1495; *Ansted* v. *Grieve*, 57 S. D. 215, 231 N. W. 912; *Hoard* v. *Jones*, 119 Kan. 1383, 237 P. 888; *Cragins Estate*, 274 Pa. 1, 117 A. 445; *Fortune* v. *Hunt*, 149 N. C. 358, 63 S. E. 82; *Gibson* v. *Gibson*, 205 Iowa 1285, 217 N. W. 852; *Ward* v. *Dougherty*, 75 Cal. 240, 17 P. 193, 7 Am. St. Rep. 151; *Stewart* v. *Silva*, 192 Cal. 405, 221 P. 191, 193. And this is true though the deed be not recorded until after the death of the grantor: *Jones* v. *Betz*, supra; *Stiles* v. *Breed*, 151 Iowa 86, 130 N. W. 376, 378; *Webb* v. *Webb*, 130 Iowa 457, 104 N. W. 438; *Collins* v. *Lamotte*, 244 Mich. 504, 221 N. W. 635; *Rogers* v. *Jones*, 172 N. C. 156, 90 S. E. 117; or though there be no affirmative showing that the grantees possession originated prior to the death of the grantor. *Blair* v. *Howell*, 68 Iowa 619, 28 N. W. 199; *Malaney* v. *Cameron*, 98 Kan. 620, 159 P. 19; *Pomper* v. *Behnke*, 97 Cal. App. 628, 276 P. 122; *White* v. *Smith*, 338 Ill. 23, 169 N. E. 81. In *Pomper* v. *Behnke*, after the death of both grantor and grantee, the deed was found in the trunk of the grantee, the putative wife of the grantor, which trunk, the court says, may have been prior to his death the trunk of both the grantor and grantee. In *White* v. *Smith*, the deed, prior to the death of the grantor, the fostermother of the grantee, was kept in a box in the home accessible to both grantor and grantee. In *Stiles* v. *Breed*, regarding the presumption or inference of delivery arising

from the recording of the deed after the death of the grantor, the court says:

"It is evidently based on the notion that, as only instruments duly delivered are recordable, such delivery should be inferred, rather than the surreptitious act of handling a deed never delivered to the recorder."

And not only is the burden of proving nondelivery upon the plaintiffs, but the inference of delivery arising from possession of the deed by the grantee and from the recording thereof is entitled to great and controlling weight and can only be overcome by clear and convincing evidence. *Giblin* v. *Giblin*, 173 Wis. 632, 182 N. W. 357; *White* v. *Smith,* supra; *Standard Trust & S. Bank* v. *Carlson*, 315 Ill. 451, 146 N. W. 446; *Ehrlich* v. *Tritt,* 316 Ill. 221, 147 N. W. 40; *Rohr* v. *Alexander,* 57 Kan. 381, 46 P. 699; In re *Cragin's Estate,* 274 Pa. 1, 117 A. 445; *Central Trust Co.* v. *Stoddard,* 4 Cal. App. 647, 88 P. 806. It was thus expressed by the court of Illinois at an early date in a leading case:

"When a deed, duly executed, is found in the hands of a grantee, there is a strong implication that it has been delivered, and only clear and convincing evidence can overcome the presumption. Otherwise, titles could be easily defeated, and no one could be regarded as being secure in the ownership of land." *Tunison* v. *Chamblin,* 88 Ill. 378, 387.

The use of the word "presumption" by so many of the courts in speaking of the effect of evidence of possession of a deed by the grantee or the recording thereof, is perhaps somewhat misleading. "No word in the legal parlance" says the author in 1 Jones Comm. Evidence (2d Ed.) 49, "is used in greater variety of senses, or more frequently misused, than the word 'presumption.' Confusion of use extends, in fact, beyond that term and includes as well the companion words 'assumption' and 'inference.'" On page 71, the author, speaking of "presumptions of law and of fact," further says that "the authorities which have con-

sidered the question as to the distinction between a presumption of fact are far from clear and it is difficult to deduce from them any rule or well defined distinction."

The author draws the distinction that "a presumption of law is in reality a rule in some particular branch of the substantive law, a general maxim of jurisprudence, or an assumption by the court of the existence of a fact not proven in order to facilitate and expedite judicial action."

So in this jurisdiction [*Ryan* v. *U. P. R. Co.*, 46 Utah 530, 151 P. 71; *State* v. *Green*, 78 Utah 580, 6 P. (2d) 177; In re *Newell's Estate*, 78 Utah 463, 5 P. (2d) 230] a "presumption of law" is a rule of law, casting the burden of proof on him against whom the presumption operates, but when the facts and circumstances are shown concerning which the presumption is indulged, the presumption ceases and the controversy is to be decided by the weight of the evidence adduced. A "presumption of fact" says the author referred to, "is, in reality nothing more than an inference demanded by logic from facts and circumstances in evidence," and usually is a question of fact, and thus different from a "presumption of law" has evidentiary value. The proposition is well put by Professor Thayer in his treatise on Evidence (p. 334) :

"It must be remembered always that many widely different things are called 'presumptions,' " and while a presumption arising in the absence of evidence is never to be weighed as evidence, yet "where, on the other hand, the 'presumption' raised by law embodies within it because of the particular set of facts to which it applies, or comes into being at the same time as, a logical inference or conclusion deducible from the evidence so far introduced, it is not the rule that such accompanying inference is not to be weighed and considered by the jury. No court would so contend, for to deny the effect of the inference would be to deny any efficacy whatever to circumstantial evidence in the face of the most trifling rebuttal. But it is the inference which stands and the evidence upon which such inferences rests which is to be weighed, and not that merely incidental rule of law termed a 'presumption' which came into being and operated at that point in the trial only to shift the burden of going forward with the evidence." Jones Comm. on Ev. (2d Ed.) § 32.

Tested by these principles, we think the evidence of the plaintiffs insufficient to sustain the burden of proof and establish the nondelivery of the deed in question. The testimony of Mr. Fletcher who took the acknowledgment and witnessed the deed, that after taking the acknowledgment he handed the deed to Miss Bennett, did not show nondelivery. Nor, indeed, would it have had that effect had he testified positively that he did not then see the deed delivered. *Thompson* v. *McKenna*, 22 Cal. App. 129, 133 P. 512. The statement by the grantor of her purpose in making the deed, "to take care of any future trouble in the event Miss Bennett died before Mrs. Fortune," did not show nondelivery of the deed. *Ehrlich* v. *Tritt*, supra. Indeed, in this respect the present case is not unlike that of *Jackson* v. *Lamar*, 58 Wash. 383, 108 P. 946, 948, where the court said:

"The mere statement of the grantor that he wanted his brother to have his interest in the property in case he passed on, to keep him from being annoyed by the heirs in the East, has no tendency to establish a nondelivery of the deed or to overcome the presumption arising from its possession by the grantee."

Nor was the fact that the deed was kept until after the death of Miss Bennett in a box to which both she and Mrs. Fortune had access, any evidence of nondelivery. *Reed* v. *Smith*, 125 Cal. 491, 58 P. 139; *Le Saulnier* v. *Loew*, 53 Wis. 207, 10 N. W. 145; *Wilson* v. *Wilson*, 32 Utah 169, 89 P. 643.

That the grantor, after the execution of the deed, continued to pay the taxes on the property, carried the insurance in her name, and expressed to various persons a desire to sell a part or all of the property is not, when the relationship existing between the grantor and grantee is taken into consideration, inconsistent with an actual delivery of the deed. At the request of the grantor in 1919, the grantee had come to Utah to live with her, and since then, these two old ladies, with no other kindred in the West, had together made their home upon the property, working together to care for the place, together becoming exhausted in such

care; and convinced that the place was too large for them, it was but natural that either or both, regardless of which held the title to the property, should want to reduce the burden by selling a part or all of the property. Both were sharing the benefits of the home; both were suffering the inconvenience of having too large a place to care for; both would be benefited by having the burden reduced. Equally natural was it that either, having the ability, should make payment of taxes and insurance and any other expense necessary for the preservation of the home enjoyed by both. The fact that the insurance was carried in the name of Miss Bennett, under the circumstances, has little if any weight. Mr. Fletcher who wrote the insurance testified that he aimed to keep the insurance in the name of the record owner. Notwithstanding the deed under which Miss Bennet acquired the property was executed June 12, 1916, the insurance was carried in the name of her brother, the former owner for more than five years thereafter, or until September of 1921, which was more than two years after the death of the brother and subsequent to the execution of the deed to Mrs. Fortune. This is not a case of a grant to a stranger where the grantor remained in possession and continued to pay taxes, etc., and we think such conduct is in no respect inconsistent with a prior delivery of the deed to the grantee, and that it is no evidence of nondelivery. *Woolley* v. *Taylor*, 45 Utah 227, 144 P. 1094; *White* v. *Smith*, supra; *Stewart* v. *Silva*, supra.

In our judgment the strongest evidence to support the finding of nondelivery of the deed in question is that of statements made by Mrs. Fortune immediately after the death of Miss Bennett to the effect that she did not know whether the place was hers, or whether it went to some one else, clearly indicating that at that time she made no claim under the deed in question, and in fact had no recollection of the deed itself.

Yet it had been clearly shown that Miss Bennett and Mrs. Fortune had together gone to Mr. Fletcher for the purpose

of having the deed prepared and executed and that it was so prepared and executed while both were present. These statements which are credited to her, so far from showing nondelivery of the deed, merely indicate that all recollection of this deed, executed in her presence nearly seven years before, had for the time at least entirely passed from her mind. Considering the evidence as a whole, it is not in our opinion sufficient to raise the presumption that Mrs. Fortune, after the death of her sister, committed the unlawful act of abstracting from the papers of her sister a deed which had never been delivered, and causing the same to be recorded as a genuine deed of Miss Bennett.

We have in this respect considered only the evidence tending to support the finding of nondelivery. There is in the record also evidence affirmatively tending to show a delivery of the deed. We may say in this case as was said by the court in *Stewart* v. *Silva,* supra:

"The situation presented by this appeal may be summed up as follows: If the trial court disbelieved all the witnesses who testified on behalf of the defendant with reference to the delivery of the deed, there is no evidence to overcome the presumption of delivery derived from the fact that the grantee had possession of the deed. If the trial court believed the testimony of these witnesses, it could not escape a finding of fact that the deed was delivered. In either event the finding of the trial court was erroneous."

It is therefore ordered that the findings of fact and conclusions of law, so far as inconsistent with this opinion, are set aside, and the judgment reversed. The cause is remanded to the district court with directions to make findings of fact and conclusions of law in conformity with this opinion, and to enter judgment in favor of defendants. Appellants to recover costs.

STRAUP, C. J., and FOLLAND and MOFFAT, JJ., concur.

ELIAS HANSEN, J.

In my opinion we should not disturb the finding of the trial court that the deed in question was not delivered. I

concur in the view expressed in the prevailing opinion that the court below was in error in adjudging that the defendants have no interest in the property. They are entitled to such interest as passed to Mrs. Fortune by reason of her being an heir of Miss Bennett.