# TUTTLE et al. v. PACIFIC INTERMOUNTAIN EXPRESS CO. et al.

No. 7619.  Decided April 3, 1952.  (242 P. 2d 764.)

See 61 C. J. S., Motor Vehicles, sec. 520. Automobiles proceeding in same direction, duties of drivers of. 5 Am. Jur., Automobiles, secs. 280-285; 104 A. L. R. 485.

*Stewart, Cannon & Hanson* and *E. F. Baldwin, Jr.,* all of Salt Lake City, for appellants.

*Christenson & Christenson,* Provo, for respondents.

WADE, Justice.

The defendants and appellants, Pacific Intermountain Express Company (P. I. E.) and its driver Heath H. Cornette, appeal from a jury verdict and judgment awarding plaintiffs damages for the death of their father and husband, Dale Tuttle. Appellants claim that the evidence is not sufficient to sustain the verdict and that the court erroneously instructed the jury.

Dale Tuttle died from injuries received in a collision between his car and a tractor and trailer of P. I. E. being driven by Cornette south of Highway 91 shortly beyond the south city limits of Provo and approaching Springville, at about 8:30 p. m. of January 15, 1949. At that time, the ground was covered with an unusually heavy snow. The highway had been clear by snow plows several feet on the shoulders on each side beyond the pavement which consisted of four lanes each 10 feet wide, making an over-all 40 foot width of the pavement. Beyond the cleared portion, there were heavy snow banks piled on the shoulders and the cleared shoulders were covered with a hard layer of snow, as were the two center lanes of pavement, but the two outside lanes on the pavement had become bare from travel. The lines marking the lanes and center on the pavement were not visible. This was a very cold slippery night; the snow on the cleared portions of the highway was frozen hard and on the pavement which was free from snow there was some ice.

The tractor-trailer carried a tachometer and a photo of the technograph chart for that evening was received in

evidence. It showed that the accident happened at about 8:36 p. m. and that the tractor immediately before it stopped was traveling more than 50 miles per hour. The tractor-trailer's combined overall length was about 50 feet. It was 8 feet wide and 12 feet high, and with a gross weight of about 31 tons or 62,000 pounds. It was traveling south. Just before the accident, it passed through a small business center consisting of a gasoline station, a soft drink place known as Lou's Place, several homes and other buildings. After the impact, the vehicles came to rest on the east side of the highway from 1000 to 1500 feet south of Lou's Place. The Tuttle car was facing north with its right side near the boundary line fence east of the highway and a few feet south of the gate in front of a house known as the Roberts' home, and the tractor stopped about 50 feet south of the car also facing north but not so far east on the east shoulder of the highway with the trailer in a jack knife position running slightly southwesterly therefrom with its west end about 10 feet on the east side of the pavement. There was evidence of heavy scratching on the snow on the pavement about 12 feet wide in the exact center of the paved portion of the highway a few feet south and east of the place where the driver pointed out as the point of impact, and on the east side of the road between the east side of the shoulder and the boundary line fence there were trees and brush growing between the places where the two vehicles came to rest which had been recently broken down and up-rooted.

Shortly before the tractor-trailer reached the business center at Lou's Place, there were two passenger cars ahead of it traveling south on the outside west lane of the highway. These cars were traveling much slower than the tractor-trailer. They were from 150 to 300 feet apart and all of the witnesses on both sides agreed and were certain that there were no other cars traveling south in that neighborhood at the time of the accident. The tractor-trailer passed the first of these cars about in front of Lou's Place and in doing so some distance north thereof it flashed its

lights up and down and constantly sounded its horn until the time of the impact, a distance of approximately one-fourth of a mile. During all that time, it was driving on the snow-covered center lanes of the highway at approximately 50 miles per hour. There is evidence that the trailer was swinging from one side to the other and caused a strong wind which whipped up a swirl of snowdust in it wake.

The damages to the vehicles show that the front end of the tractor struck the left side of the Tuttle car head on and at right angles, completely crushing the body between the front and back wheels. After the collision, a power pole was crashed into on the east side of the road causing a long, bright flash similar to lightning and the wires were loosened so that they sagged down nearly to the pavement across the road so that cars could not pass on the highway until the wires were removed without driving over the wires or raising them up so cars could drive under them.

The appellants claim that the Tuttle car was the head car of the two cars which were traveling in a southerly direction on the west side of the highway in front of the tractor-trailer and that it suddenly and without any warning turned east into the course of the approaching tractor-trailer when it was no near that the collision was unavoidable. They argue that since three witnesses, the driver of the tractor-trailer and Mr. and Mrs. McPhie who were walking on the west side of the highway between Lou's Place and their home, each testified that he saw the Tuttle car make that turn and the collision, and since no witness claims to have seen the Tuttle car coming from the south collide with the tractor-trailer, there is only confusion, speculation and possibility shown but no evidence to support a finding that the Tuttle car was coming from the south. If the evidence is such that it would be unreasonable for anyone to believe therefrom that the Tuttle car was traveling in a northerly direction before the collision and not in a southerly direction as appellants claim, then it is clear that decedent was guilty of contributory negligence

as a matter of law. But if the evidence will reasonably sustain a finding that decedent was traveling toward the north on the east side of the highway and that as they were about to pass each other while traveling in opposite directions the tractor-trailer went out of control and skidded over onto the east side of the highway and into the side of the Tuttle car, there is no showing of negligence on the part of the decedent and there is a strong case of negligence on the part of the driver of the tractor-trailer and it was proper to submit that question to the jury.

The Tuttle car was struck in the middle of the left hand side by the front of the tractor-trailer. This could have happened in either one of two ways, one consistent with plaintiffs' theory and the other with defendants'. If the Tuttle car was traveling south and suddenly turned to the left across the course of the tractor-trailer, the front of the tractor-trailer would strike the left hand side of the car and the same is true if the tractor-trailer suddenly went out of control and turned sharply to the east into the left hand side of the Tuttle car traveling north as it passed. So the fact that the Tuttle car was struck on the left hand side does not prove either plaintiffs' or defendants' theory of how the accident occurred.

There were nine witnesses other than the driver who could see the back of the truck at the time of the impact. Three witnesses, the driver and the two McPhies, claimed that they were looking directly at the Tuttle car when it suddenly and without any warning turned toward the east and into the course of the truck. One other witness, Mr. Stevenson, testified that he did not see the turn but thought that a car driving ahead of him toward the south did suddenly turn into the course of the tractor-trailer in that manner. Some other witnesses were also of that opinion at first, but after hearing the claim that the Tuttle car was traveling toward the north changed their minds in that respect. All of the witnesses on whom the appellants rely

testified positively that at the time of the accident there were only two cars and the tractor-trailer traveling toward the south in that neighborhood at the time of the accident, one of them the tractor-trailer passed in the vicinity of Lou's Place and the other turned in front of the tractor and was in the collision. If there was another car going south on the west side of the highway which was passed by the tractor-trailer just before the accident, then the Tuttle car was not on the west side of the highway going south and did not turn into the course of the tractor for according to appellants' witnesses there were only two cars going south on the west side of the road just before the accident and one was passed by the tractor near Lou's Place and if the tractor passed another one before the accident, then there was no car left to turn in front of it and it must have collided with a car coming from the south. In any event, if there was another car traveling south at that point, it would be between the McPhies and Stevenson so they could not see whether a car turned in front of the tractor or not.

Two witnesses, Beardall and Holt, both testified that they were traveling south on the west side of the highway just before the impact, and that they were so close to the tractor-trailer that they could barely stop their car in time to avoid running into the wire that came down across the highway. These men were recognized by a number of other witnesses as being at the scene of the accident immediately after it occurred. Beardall was acquainted with Dale Tuttle and his wife, and recognized him when he was taken from the ruins of his car, and he immediately drove to Tuttle's father-in-law's home and notified him of the accident and then went and picked Mrs. Tuttle up at a basketball game and took her to the hospital. That these men were at the scene of the accident there is no question. There is nothing improbable about their testimony, there seems to be no reason why they should not tell the truth about what they saw there and where they were at the time of the

accident, and there is no showing that even if these witnesses wished to tell something other than the truth in order to help the plaintiffs in this suit that they knew what the other witnesses would testify to in order to make up a story and facts to meet the testimony of the other witnesses. Yet if these witnesses came onto the scene of the accident as they claim, then the McPhies did not see the Tuttle car turn in front of the trailer-tractor because the Beardall car was between them and the accident and all of the witnesses who claimed to know were mistaken on how many cars were traveling south on the highway at the time or else the Tuttle car was, as plaintiffs claim, traveling north.

The McPhies were several hundred yards north of the place of impact when it occurred, the tractor-trailer left in its wake a swirl of snow dust so that it would be hard to see clearly what did happen at the time of the accident. If the Beardall car was where he and Holt claimed it was, it would be very easy for the McPhies to think they saw it turn in front of the truck and this would be supported in their minds since when they got up to the scene of the accident the Beardall car had backed across the street and there was no car remaining on the west side of the street except the Stevenson car which drove up about the time they arrived at the scene of the accident. Preceding and following this accident, there were a number of exciting events. A 50-foot long tractor-trailer drove down the road on a cold winter night at a high rate of speed leaving a trail of snow dust in its wake and sounding its horn continuously for a distance of about a quarter of a mile. Sounding the horn for such a distance seems unusual if the driver saw only two cars on the road ahead of him well over on their right hand side of the road, as the evidence shows they were, and no cars coming from the opposite direction. It would be improbable that one of these cars ahead of him would suddenly turn in front of that heavy tractor-trailer without any warning after such a long sounding of the horn. Following that, there was a crack of the colliding

cars immediately followed by a crash into a power pole and a long bright flash of light. Under such circumstances, it would be very hard for any witness to accurately interpret what he saw. It would be very easy for defendants' witnesses other than the driver to be honestly mistaken as to what did happen. While the driver could not have mistakenly believed that he saw a car turn into his course from the west side, neither could Beardall and Holt by mistake believe that they came to the scene of the accident as they testified on the west side of the highway just behind the tractor-trailer at the time of the crash.

The plaintiffs produced five witnesses who testified positively that Dale Tuttle left his father-in-law's home a very few minutes before 8:30 on the evening of the accident on his way to Provo, shortly after he left that home he drove his car out from his own home across the street ■ and was followed out to the main highway by his wife and mother-in-law where he turned north and they turned the other way. And within 15 or 20 minutes after he left his father-in-law's home, Beardall and Holt came and told the father-in-law and another guest of the accident. This certainly does not give much time for him to drive into Provo and turn around and come back to the scene of the accident and then again turn into the course of the oncoming truck. It also seems rather improbable that he would be making so many turns as such a course would require even if he had time to do so. There are other facts which point to the same conclusion, though not so positively, which we do not deem it necessary to point out. But the circumstances above referred to seem to make it a clear case of a conflict in the evidence and are sufficient from which the jury could reasonably believe that the Tuttle car was coming from the south just before the collision and that it did not turn from the west into the course of the trailer-tractor, but that the tractor went out of control and turned into the side of it.

One other matter requires comment. The court instructed the jury that in

"the absence of evidence to the contrary there is a presumption that the deceased used due care for his own protection"

then ended the instruction by saying

"if you find that deceased was guilty of negligence in one or more of the particulars as set forth in instruction No. 1 and that such negligence proximately contributed to his own injury and death, then your verdict must be in favor of the defendants and against plaintiffs".

Defendants claim this was error because there was evidence that decedent turned his car directly into the course of the approaching tractor and that an instruction on such a presumption is only proper when there is no evidence as to how the deceased acted at the time in question.

The term "presumption" is properly ■

"used to designate the assumption of the existence of one fact which the law requires the trier of fact to make on account of the existence of another fact or group of facts, standing alone".[1]

The ordinary presumption merely places on the party claiming the non-existence of the presumptive fact the burden of producing evidence from which the fact trier could reasonably find the non-existence of such fact. In other words, it places on the opposing party the ■ burden of going forward with the evidence or of making a prima facie case on that issue.[2] If the opponent

[1] See "Some Observations Concerning Presumptions" by Edmond M. Morgan, 44 Harvard Law Review 906, and authorities there cited.

[2] See note 1 supra, and "Instructing the Jury on Presumptions and Burden of Proof," by Edmond M. Morgan, 47 Harvard Law Review 59, 60; see same author "Presumptions: Their Nature, Purpose and Reason", pamphlet published by the Brandeis Lawyers Society, and American Law Institute Model Code of Evidence, Rule 704, Introductory note and comment thereon.

fails to meet this burden the presumptive fact should be assumed and the jury should be so instructed if the facts on which the presumption is based is established, but if the required burden is satisfied by the opponent the presumption disappears and the facts must be established from the evidence the same as though no presumption were ever involved and it is not proper in such case to even mention in the instructions the existence of such presumption.[3]. This court has many times held that such is the effect of presumptions generally[4] and of this presumption in particular.[5] Of course, we must keep in mind that the facts on which the presumption is based are in evidence even though the presumption has been destroyed by proof tending to show the non-existence of the presumptive fact, and to the extent that they logically tend to prove the presumptive fact they may be considered by the jury for that purpose.[6]

Here the jury could reasonably find from the evidence that decedent was driving his car toward the south and turned his car suddenly and without warning into the course of the tractor-trailer when it was too late to avoid an accident and in so doing he did not use reasonable care for his own safety. So the presumption was thereby destroyed and instruction the jury thereon could only confuse rather than enlighten them, but this was not prejudicial. The court merely instructed that there was a presumption in the absence of evidence to the contrary and that question should not give the jury trouble

---

[3]See "Instructing the Jury on Presumptions and Burden of Proof" in note 2 above.

[4]*In re Newell's Estate*, 78 Utah 463, 5 P. 2d 230.

[5]*Clark* v. *Los Angeles & S. L. R. Co.*, 73 Utah 486, 275 P. 582; *Ryan* v. *Union Pac. Ry. Co.*, 46 Utah 530, 151 P. 71; *State* v. *Steadman*, 70 Utah 224, 259 P. 326; *State* v. *Green*, 78 Utah 580, 6 P. 2d 177.

[6]See my concurring opinion *In re Pilcher's Estate*, 114 Utah 72, 197 P. 2d 143, and *State* v. *Prettyman*, 113 Utah 60, 191 P. 2d 142, 147-149.

although it was a question for the court and not the jury to decide.[7] The jury was properly instructed that defendant had the burden of persuading them that decedent was guilty of contributory negligence, which is a greater burden than that which the presumption would place on them had it not been destroyed. So this instruction was not prejudicial for as Mr. Justice Lummus of the Supreme Judicial Court of Massachusetts once said it would be like a "hankerchief thrown over something covered by a blanket also".[8]

Some evidence of insurance agents inadvertently got into the record. But we do not think it prejudicial under the circumstances shown; this is especially so because one of the defendants is a large corporation and there is no apparent reason why a jury would find against an insurance company and not against such a defendant.

Judgment affirmed. Costs to respondents.

McDONOUGH, J., concurs.

CROCKETT, Justice.

I concur in affirming the judgment.

The jury's verdict for the plaintiff plainly shows that they did not believe the deceased was going southward, but on the contrarry their finding was that he was coming toward the north. Under those circumstances, there is no evidence whatsoever regarding his conduct just preceding his death. Therefore, the plaintiff is entitled to the presumption that he used due care for his own safety, and upon that presumption the jury could base their refusal to find him guilty of contributory negligence.[9]

---

[7]See authorities above cited.

[8]*Epstein* v. *Boston Housing Authority*, 317 Mass. 297, 302, 58 N. E. 2d 135.

[9]*Lewis* v. *Rio Grande Western R. R. Co.*, 40 Utah 483, 123 P. 97.

Inasmuch as the jury, must of necessity have found deceased was traveling toward the north and, under that state of facts, there is no evidence whatsoever of his conduct just prior to the collision, it seems unnecessary to a decision of this case to set up any standard as to the quantum of proof necessary to overcome the presumption of due care.

WOLFE, Chief Justice.

I dissent.

All of the eyewitnesses to the accident testified that it occurred when the deceased's car attempted to make a U-turn directly in front of the defendants' truck. The truck driver stated that he was trying to pass two cars which were traveling in the outside south-bound lane of the four-lane highway, when the southernmost car swung directly in front of him. Mr. and Mrs. McPhie and Mr. Roberts were walking south on the west side of the highway toward the McPhie home at the time the accident occurred. Mrs. McPhie noticed the Tuttle car slow down and pull off to the right (west) side of the highway. Her attention became focused on the car because she thought the car might be stopping at her home. She testified that the car slowed up, then, without any signal being given, it turned suddenly in front of the truck when the truck was 20 or 25 feet behind it. Mr. McPhie also noticed the Tuttle car pull over to the west edge of the cement and then make a U-turn into the path of the truck. Mr. Roberts did not actually see the collision. *The Tuttle car was struck in the middle of the left-hand side.* This is indelible evidence corroborating the testimony of the McPhies. The truck must have struck it broadside on the left-hand side as it was turning.

The plaintiffs' version of the accident is that Tuttle was traveling north. This is based on the evidence of various friends and relatives who saw Tuttle leave his home in Springville and estimated the time to be shortly before

8:30 p. m. The tachometer on the truck recorded the time of the accident's occurrence at 8:35 p. m. The location of the accident was 3.7 miles north of the Tuttle home in Springville and 1.6 miles south of the semaphore light at Seventh East and Third South Streets in Provo, Utah. The plaintiffs contend that Dale Tuttle could not possibly have had time to proceed north of the point of the accident, turn around, and then be struck as he was turning the second time. There is a dispute in the testimony as to whether witness Stevenson's car was first to reach the scene of the accident, or whether witnesses Beardall and Holt were first to arrive. If the jury believed that Beardall arrived first, then conclusions are argued from this fact that Tuttle was traveling north!; that his (Tuttle's) could not have been the first car going south. Yet Mr. and Mrs. McPhie stated positively that the Tuttle car pulled over to the side of the road, as if it were going to stop at their home, but when it slowed down to five or ten miles per hour, it swung directly into the path of defendant's truck. No one saw headlights coming from the south. It was a cold, clear night.

As difficult as it may be to explain why the deceased was traveling south and then decided to make the U-turn, the plaintiffs' evidence relating to the elapsed time is not sufficient to permit a finding that deceased was going north in view of McPhies' uncontradicted testimony. There is no evidence that the McPhies' vision was obstructed in any way. They both saw the impact from a distance of 300 feet. In *Seybold* v. *Union Pacific R. Co.,* 121 Utah 61, 239 P. 2d 174, 177, we stated:

"If there is any substantial competent evidence upon which a jury acting fairly and reasonably could make the finding it should stand."

There we held that negative testimony of the plaintiff as to what he did not see measured against affirmative testimony of a disinterested eyewitness in position to clearly observe, made the testimony of the former such that *under the circumstances* it could not reasonably be believed by a

jury. I think this case falls under that category. Absent all eyewitnesses' testimony, it would appear more probable, in view of the elapsed time between Tuttle's leaving Springville and the accident, that he was traveling north. But a four or five minute variance in the estimation of time, or in the difference in time that the tachometer was set, compared to that of the watches of the witnesses for the plaintiffs, would give the deceased sufficient time to drive into Provo and then retrace his path and travel south. So long as the evidence as to time does not of necessity compel a finding that deceased was going north instead of south, I do not believe that it can be considered substantial or competent so as to permit a jury acting *fairly* and *reasonably* to refute the disinterested eyewitnesses' account of what happened. The collateral issue concerning which car, Beardall's or Stevenson's, arrived first at the scene of the accident does not add sufficient substantiation to plaintiffs' version of the accident to make out an issue of fact for the jury to decide. The theory that the Tuttle car was going north and that the truck skidded into it has the appearance of having been invented. It was the only way in which the truck hitting it broadside on the left side could be explained without stepping into the actual facts. But the actual happening is so corroborated by disinterested eyewitnesses of the collision, plus the fact that Stevenson testified that he followed a blue Plymouth car south from Provo (Tuttle's car was a blue Plymouth and the only blue Plymouth in that procession) that no jury could reasonably find otherwise than that the Tuttle car, proceeding south, turned in front of the P. I. E. truck. The case should be reversed with directions to dismiss the cause of action.

Nor in an attempt to uphold this verdict should we cast aside as nonprejudicial error the established rule that:

"When, however, facts and circumstances are proven to show just what the deceased did, or failed to do, then his care or the want of it, is to be determined, not on the presumption [that he used due care for his own safety], but upon the facts and circumstances proven.

That is, whenever the facts or circumstances are shown concerning which the presumption is indulged, the presumption ceases, and the controversy is to be decided by the weight of the evidence adduced." *Ryan* v. *Union Pacific R. Co.,* 46 Utah 530, 151 P. 71, 74.

No authority has yet asserted that the presumption that deceased used due care for his own safety was "created to further a result judicially deemed socially desirable" such as the presumption of the legitimacy of a child born in wedlock and the presumption of the validity of a ceremonial marriage. See Edmond M. Morgan's article, "Some Observations Concerning Presumptions", 44 Harvard Law Review, pages 931-32, quoted in Mr. Justice Wade's concurring opinion in *In re Pilcher's Estate,* 114 Utah 72, 197 P. 2d 143, 153. This presumption of the deceased having used due care for his own safety is a procedural device. Its purpose is to place the burden upon (normally) the defendant to produce evidence of plaintiffs' contributory negligence. It is a presumption of law and not of fact. A presumption of law is a presumption furnished by the law. This presumption is not one which arises out of or from basic facts put in evidence. The presumption is "furnished" by the law when there is no evidence as to how the accident happened because from the experience of mankind the law concludes that men do not knowingly or intentionally act in derogation of their instinct to preserve themselves or act or fail to act in such a way as to bring harm to themselves. But this presumption that they do use due care for their own safety is a weak and easily rebuttable presumption because it has also been the experience of mankind that men are very often careless and that they do act without circumspection. Hence, where there is *any* evidence which shows how or why the accident happened (circumstances of it) the presumption that the party who was clothed with it used due care, is sluffed off and the plaintiff is left with his proof, which, of course, may include facts in his favor elicited from or presented by his opponent. If it is thought to be non-prejudicial because the lan-

guage of the presumption added to the instruction concerning the defendants' burden of proof is likened to throwing a handkerchief over something already covered by a blanket, the answer is that what is added to the blanket is something different in quality. By the instruction we have not only added to the defendants' burden to prove deceased's negligence (the blanket), but we have permitted the blanket to plant in the minds of the jurors the idea (the handkerchief) that they may start with the knowledge that the law furnishes a presumption that the decedent exercised due care where that presumption did not under the evidence any longer attend deceased. The burden of the defendant to prove negligence on the part of the plaintiff is the same as the burden of the plaintiff to prove negligence on the part of the defendant using "burden" in the sense of legal duty or obligation and not as a measure of the task. Both parties' burden of proof are equal in law. I do not think this court can conclude that the jury's *admitted* confusion was not prejudicial to the defendant. With all the evidence before it concerning the manner in which deceased acted, the jury was instructed that the defendant had the burden of proving contributory negligence and that "there is a presumption that the deceased used due care for his own protection". This may have led them to believe that they should determine whether the evidence not only satisfied them that the deceased was negligent, but to so determine in the face of a rule of law that he was presumed not guilty of such conduct. Knowledge that the presumption serves only a procedural purpose in the administration of a lawsuit and is not intended as a substantive pronouncement cannot be imputed to the lay jurors. Nor is the susceptibility to an erroneous impression made clearer by the saving clause, "In the absence of evidence to the contrary". This phrase could likewise rectify all error in instructions into which it was inserted; last clear chance, assumption of risk, anything may be determined in the absence of evidence to the contrary.

The rule is simple and easy to follow: Whenever any evidence is adduced contrary to the presumption, the presumption disappears and no longer serves any function in the trial of a lawsuit. See *In re Newell's Estate,* 78 Utah 463, 486, 5 P. 2d 230. The only exception to this rule is when we determine to make a forthright declaration that the presumption is substantive and "created to further a result judicially deemed socially desirable", Edmond M. Morgan, supra. therwise, we are increasing one party's burden of proof.

At this point, it becomes material to point out statements contained in Mr. Justice Wade's opinion in regard to the presumption of the use of due care, which I think are inaccurate and misleading. Above I stated why the law furnished the presumption of due care and when it disappeared and no longer played any part in the case. Mr. Justice Wade and I seem to be in agreement on this idea that evidence of how the accident happened would strip the presumption from one otherwise clothed with it. I have difficulty with the underlined portion of the statement in his opinion reading that

"If the opponent fails to meet this burden the presumptive fact should be assumed and the jury should be so instructed *if the facts on which the presumption is based is established, but if the required burden is satisfied by the opponent the presumption disappears* and the facts must be established from the evidence the same as though no presumption were ever involved \* \* \*." (Emphasis added by me.)

The "required burden" as used in the quoted sentence, I assume, is not that of satisfying a particular quantum of proof or of introducing enough evidence to satisfy the jury that the presumption or presumptive fact is overcome. *The burden is only that of going forward.* If this is kept in mind, I see nothing wrong with that particular statement. Then it is for the court to determine whether the "opposing party" has gone forward by introducing some evidence of

how the accident happened but, if so, it does not need to be sufficient evidence to satisfy the jury or fact finder that the presumption has been overcome, but only some evidence as to how the accident happened. Then the fact finder determines without mention of any presumption under proper instructions the question of liability. But when the statement is read in conjunction with the statement reading:

"Of course, we must keep in mind *that the facts on which the presumption is based are in evidence* even though the presumption has been destroyed by proof tending to show the non-existence of the presumptive fact [presumption], and to the extent that they logically tend to prove the presumptive fact they may be considered by the jury for that purpose." (Emphasis supplied by me.)

The thought is misleading because the presumption in this case is not based on facts in evidence "in this case" but, as explained above, on the general knowledge of mankind. The presumptions discussed in the concurring opinion *In re Pilcher's Estate* may have included presumptions founded on the facts in evidence in that case. That concurring opinion touched on various kinds of presumptions. I did not concur in that concurring opinion because I was not prepared to agree to all the statements made therein. It seemed to me that unless we confine our remarks to the particular presumption which has an office in the particular case at hand, we tend to confuse the subject of presumptions. In this case, it seems we are attempting to achieve credence for some general statements about presumptions which do not apply to the presumption at hand. For that reason, I am pointing out how such statements are misleading. The phrase reading, "*   *   * but if the required burden is satisfied   *   *   *"" may not in itself be misleading, if it is kept in mind that the "required burden" referred to is only the burden of going forward and not the burden of overcoming a presumption or a so-called "presumptive fact". But it becomes misleading when coupled with the statement that "*   *   * facts on which the presumption

is based are in evidence  *  *  *" when the presumption which attends a person that he used due care for his own safety arises out of the fact of the instinct for self preservation. What was in this case but not in the evidence was that presumption which attended the deceased until evidence appeared to the contrary. But *evidence* that he did or did not exercise due care for his safety was not the basis for that presumption. It was evidence independent of the presumption which either strengthened what the presumption would have furnished or destroyed it. And in either case there was no room for the presumption to stay in the case. It was "destroyed" when any evidence of deceased's negligence was introduced regardless of whether that evidence was such as to satisfy the fact finder that the required burden of the defendant *in order to prevail* was met.

Indeed the statements

"* * * we must keep in mind that the facts on which the *presumption is based* are in evidence even though the presumption has been destroyed * * * and to the extent that they logically tend to prove the presumptive fact they may be considered by the jury for that purpose"

seem to be contradictory to the statement that the presumption or "presumptive fact"—that the party, in this case the decedent, had exercised due care for his own safety— has been destroyed and should not be mentioned in the instructions. I submit the basic error in this part of the main opinion is to hold that facts on which the presumption is based are in evidence when what is really in evidence are the facts of decedent's not using due care which effectively destroyed the presumption or "presumptive fact" that he, the decedent, did use due care for his own safety and left the case bare of any presumption and to be decided purely on evidence introduced and submitted to the jury, provided, of course, it could go to the jury, which in my view as stated above, could not be the case.

HENRIOD, J., did not participate.